Filed 9/11/24

# IN THE SUPREME COURT OF CALIFORNIA

In re DEZI C. et al., Persons Coming
Under the Juvenile Court Law.

---

LOS ANGELES COUNTY DEPARTMENT OF CHILDREN
AND FAMILY SERVICES,
Plaintiff and Respondent,

v.

ANGELICA A.,
Defendant and Appellant.

S275578

Second Appellate District, Division Two
B317935

Los Angeles County Superior Court
19CCJP08030A and 19CCJP08030B

---

**ORDER MODIFYING OPINION**

THE COURT:

The opinion in this matter, which was filed August 19, 2024, is modified as follows:

1. The third sentence of the paragraph on page 16, which states, " 'By contrast, other courts have applied "a hybrid substantial evidence/abuse of discretion standard, reviewing for substantial evidence whether there is reason to know a child is an Indian child, and for abuse of discretion a

1

juvenile court's finding that an agency exercised due diligence and conducted a 'proper and adequate' ICWA inquiry" ' " is modified to read:

> "By contrast, other courts have used a hybrid standard, reviewing for substantial evidence whether there is reason to know a minor is an Indian child, and reviewing a finding of due diligence and proper inquiry for abuse of discretion."

> This modification does not affect the judgment.

# IN THE SUPREME COURT OF CALIFORNIA

In re DEZI C. et al., Persons Coming
Under the Juvenile Court Law.

---

LOS ANGELES COUNTY DEPARTMENT OF CHILDREN
AND FAMILY SERVICES,
Plaintiff and Respondent,

v.

ANGELICA A.,
Defendant and Appellant.

S275578

Second Appellate District, Division Two
B317935

Los Angeles County Superior Court
19CCJP08030A and 19CCJP08030B

---

August 19, 2024

Justice Evans authored the opinion of the Court, in which
Justices Corrigan, Liu, Kruger, and Jenkins concurred.

Justice Kruger filed a concurring opinion, in which Justice
Corrigan concurred.

Justice Groban filed a dissenting opinion, in which Chief
Justice Guerrero concurred.

This opinion follows companion case *In re Kenneth D.*, S276649, also filed this date.

In re DEZI C.

S275578


Opinion of the Court by Evans, J.


In 1978, Congress enacted the Indian Child Welfare Act
(ICWA; 25 U.S.C. § 1901 et seq.) to "formalize[] federal policy
relating to the placement of Indian children outside the family
home." (*In re W.B.* (2012) 55 Cal.4th 30, 40 (*W.B.*).) Under
ICWA's state analogue, the California Indian Child Welfare Act
(Cal-ICWA), courts and child welfare agencies are charged with
"an affirmative and continuing duty to inquire whether a
child . . . is or may be an Indian child" in dependency cases.
(Welf. & Inst. Code, § 224.2, subd. (a).) Child welfare agencies
discharge this state law duty by "asking the child, parents, legal
guardian, Indian custodian, extended family members, others
who have an interest in the child, and the party reporting child
abuse or neglect, whether the child is, or may be, an Indian child
and where the child, the parents, or Indian custodian is
domiciled."[1] (*Id.*, subd. (b).)

We are tasked with determining whether a child welfare
agency's failure to make the statutorily required initial inquiry
under California's heightened ICWA requirements constitutes
reversible error. California courts have reached differing

---

[1] The language of both federal and state law uses the term
"Indian." California courts have used alternative terms, such as
"American Indian" or "Native American"; we use the term
"Indian" throughout to reflect the statutory language but keep
the terminology used by the various courts when quoting from
their opinions. No disrespect is intended.

conclusions on this issue, and we granted review to resolve this conflict. ICWA and Cal-ICWA are unique statutory schemes that are intended to protect Native American heritage, cultural connections between tribes and children of Native American ancestry, the best interests of Indian children, and the stability and security of Indian tribes and families. (See *In re Isaiah W.* (2016) 1 Cal.5th 1, 7–8 (*Isaiah W.*); 25 U.S.C. § 1902; Welf. & Inst. Code, § 224, subd. (a).) When there is an inadequate inquiry and the record is underdeveloped, it is impossible for reviewing courts to assess prejudice because we simply do not know what additional information will be revealed from an adequate inquiry. We therefore hold that an inadequate Cal-ICWA inquiry requires conditional reversal of the juvenile court's order terminating parental rights with directions to the agency to conduct an adequate inquiry, supported by record documentation. Accordingly, we reverse the judgment of the Court of Appeal with directions to conditionally reverse the order terminating parental rights and remand for further proceedings consistent with our opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Angelica A. (mother) and Luis C. (father) have two children, Dezi C. (born in May 2016) and Joshua C. (born in April 2018). (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 775 (*Dezi C.*).) In 2019, the Los Angeles County Department of Children and Family Services (Department) filed petitions pursuant to Welfare and Institutions Code[2] section 300 seeking to assert dependency jurisdiction over Dezi and Joshua and alleging the minors were at risk of harm in the custody of mother and father

---

[2] Subsequent statutory references are to the Welfare and Institutions Code unless otherwise specified.

due to the parents' substance abuse and domestic violence issues.

Mother and father completed Parental Notification of Indian Status (ICWA-020) forms prior to the detention hearing, and each indicated, "I have no Indian ancestry as far as I know."

The initial detention hearing was held in December 2019. The court asked the parents about the accuracy of the ICWA-020 forms and whether they had Indian heritage. Mother and father denied having Indian heritage, and the court found this was not an ICWA case. The court ordered the parents to provide the Department with the name, address, and any other identifying information of maternal and paternal relatives but did not explain why this information was necessary.

In February 2020, the juvenile court held a combined jurisdictional and dispositional hearing. It sustained the allegations of the petitions, removed Dezi and Joshua from the custody of their parents, and ordered the Department to provide the parents with family reunification services in accordance with the case plans of each parent.

A six-month review hearing was held in August 2020. At that hearing, the juvenile court concluded mother and father were not in compliance with their case plans, terminated reunification services, and set the matter for a permanency planning hearing pursuant to section 366.26.

At the section 366.26 permanency hearing, held in January 2022, the juvenile court concluded by clear and convincing evidence that the children were adoptable and were likely to be adopted by their paternal grandparents. The court

terminated mother's and father's parental rights. ICWA was not mentioned.

In investigating the allegations underlying the dependency petitions, Department social workers spoke with paternal grandparents, maternal grandparents, father's siblings, mother's siblings, and one of father's cousins. (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 776.) It is undisputed that the social workers did not ask any of these individuals whether mother, father, Dezi, or Joshua had Indian ancestry. (*Ibid.*) This is despite the facts that: mother, father, and the children resided with paternal grandparents before the court asserted jurisdiction over the children and throughout the dependency proceedings, and paternal grandparents were likely to adopt the children; father's cousin appeared at the detention hearing; and maternal grandparents appeared at the adjudication and disposition hearing.

Mother appealed the termination of her parental rights. Her sole contention on appeal was that the Department failed to comply with its duty under ICWA and related California provisions to initially inquire of "extended family members" (§ 224.2, subd. (b)) regarding the children's possible Indian ancestry. The Court of Appeal found it was "undisputed that the Department's initial inquiry was deficient" and thus concluded that the operative question was whether "the Department's defective initial inquiry in this case render[ed] invalid the juvenile court's subsequent finding that ICWA does not apply (and thus render[ed] invalid the court's concomitant order terminating mother's parental rights)?" (*Dezi C.*, *supra*, 79 Cal.App.5th at pp. 776–777.)

The Court of Appeal noted that "California courts have staked out three different rules for assessing whether a defective initial inquiry is harmless." (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 777.) It considered and rejected the rules in favor of its own fourth rule. The Court of Appeal held that if an agency's inquiry is deficient, that defect "is harmless *unless the record contains information suggesting a reason to believe* that the child may be an 'Indian child' within the meaning of ICWA." (*Id.* at p. 779, italics added.) It found this rule "best reconciles the competing policies at issue when an ICWA objection is asserted in later at the final phases of the dependency proceedings" (*id.* at p. 781), while also respecting the California Constitution's requirement that a judgment not be set aside "unless it 'has resulted in a miscarriage of justice.'" (*Id.* at p. 779, citing Cal. Const., art. VI, § 13.) The Court of Appeal also observed that "[w]here, as here, there is no doubt that the Department's inquiry was erroneous . . . we must assess whether it is reasonably probable that the juvenile court would have made the same ICWA finding had the inquiry been done properly." (*Id.* at p. 777, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

We granted review. Since that time, a number of Courts of Appeal have weighed in on the split of authority, and we have granted review and deferred further action in some of those matters until after this case is decided. (*In re G.A.* (2022) 81 Cal.App.5th 355, review granted and held Oct. 12, 2022 [following *Dezi C.* rule and concluding error was harmless]; *In re M.M.* (2022) 81 Cal.App.5th 61, review granted and held Oct. 12, 2022 [declining to adopt "reversal per se" approach and finding error harmless under all other standards]; *In re An. L.* (Dec. 8, 2022, B315986) [nonpub. opn.], review granted and held

Mar. 22, 2023; *In re Athena R.* (Dec. 13, 2022, B318751) [nonpub. opn.], review granted and held Mar. 22, 2023; *In re D.D.* (Dec. 8, 2022, B319941) [nonpub. opn.], review granted and held Mar. 1, 2023; *In re E.T.* (Oct. 4, 2022, B315104) [nonpub. opn.], review granted and held Dec. 28, 2022; *In re M.G.* (Oct. 28, 2022, B317366) [nonpub. opn.], review granted and held Jan. 18, 2023; *In re R.T.* (July 6, 2022, B315541) [nonpub. opn.], review granted and held Oct. 12, 2022; *In re Tyler C.* (Feb. 3, 2023, B316341) [nonpub. opn.], review granted and held Apr. 26, 2023; *In re X.R.* (Jan. 31, 2023, B318808) [nonpub. opn.], review granted and held Apr. 12, 2023; *In re Z.C.* (Sept. 26, 2022, C094803) [nonpub. opn.], review granted and held Dec. 28, 2022.)

## II.   DISCUSSION

The sole question presented in this case is a narrow one: whether a child welfare agency's failure to make a proper inquiry under California's heightened ICWA requirements constitutes reversible error. This is a question of law that we consider de novo. (*Tansavatdi v. City of Rancho Palos Verdes* (2023) 14 Cal.5th 639, 652.)

### A. Governing Law/ICWA

#### 1. *Background of ICWA*

Congress enacted ICWA in 1978 in response to "rising concern in the mid–1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." (*Mississippi Choctaw Indians Band v. Holyfield* (1989) 490 U.S. 30, 32 (*Holyfield*); see also 25 U.S.C. § 1901(4)

[finding "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies"].) After congressional investigation spanning several years and encompassing multiple hearings, Congress found that many of the problems resulting in the widespread separation of Indian children were caused by the states, which encouraged the practice and "failed to account for legitimate cultural differences in Indian families." (ICWA Proceedings, 81 Fed.Reg. 38778, 38780 (June 14, 2016); see also *id.* at p. 38781.) State procedures also frequently violated due process. (*Id.* at p. 38781.) The separation of Indian children "contributed to a number of problems, including the erosion of a generation of Indians from Tribal communities, loss of Indian traditions and culture, and long-term emotional effects on Indian children caused by loss of their Indian identity." (*Id.* at p. 38780.)

Based on these findings, in enacting ICWA, Congress declared "that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . ." (25 U.S.C. § 1902.) It also acknowledged "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children . . ." and "the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing

in Indian communities and families." (25 U.S.C. § 1901(3), (5); see also *Holyfield*, *supra*, 490 U.S. at pp. 35–36.)

ICWA establishes minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes and does not prohibit states from establishing higher standards. (25 U.S.C. § 1921; 25 C.F.R. § 23.106 (2024); see also *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 783.) Indeed, ICWA expressly yields to state laws that provide "a higher standard of protection to the rights of the parent or Indian custodian of an Indian child . . . ." (25 U.S.C. § 1921; § 224, subd. (d).)

ICWA gives "Indian tribes concurrent jurisdiction over state court child custody proceedings that involve Indian children living off of a reservation." (*W.B.*, *supra*, 55 Cal.4th at p. 48.) The tribe also has the power to petition the court to invalidate any action taken in a custody proceeding if the action violated ICWA. (25 U.S.C. § 1914; see also § 224, subd. (e).) Thus, when ICWA applies, "the Indian child's tribe shall have a right to intervene at any point" in a proceeding involving the removal of an Indian child from their family. (25 U.S.C. § 1911(c); § 224.4; *In re K.T.* (2022) 76 Cal.App.5th 732, 741.)

### 2. *Relevant Provisions of ICWA*

The issue of whether ICWA applies in dependency proceedings turns on whether the minor is an Indian child. An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) At the commencement of a child custody proceeding,

the court is obligated to inquire from each participant[3] whether there is a "reason to know" that the child is or may be an Indian child. (25 U.S.C. § 1912(a); 25 C.F.R. § 23.107(a) (2024).) The increased protections of ICWA apply "where the court knows or has reason to know that an Indian child is involved." (25 U.S.C. § 1912(a); 25 C.F.R. § 23.107(b)(2) (2024).)

In 2016, new federal regulations were adopted addressing ICWA compliance. (See ICWA Proceedings, 81 Fed.Reg., *supra*, at p. 38864 [revising 25 C.F.R. § 23 (2016)].) The regulations are binding on state courts, are intended to "improve ICWA implementation," and clearly identify what actions state courts and agencies must undertake to ensure ICWA implementation in child welfare proceedings. (ICWA Proceedings, 81 Fed.Reg, *supra*, at p. 38778.) The regulations urge early compliance with ICWA, as it "promotes the maintenance of Indian families, and the reunification of Indian children with their families whenever possible, and reduces the need for disruption in placements. . . . And early implementation of ICWA's requirements conserves judicial resources by reducing the need for delays, duplication, and appeals." (*Id.* at p. 38779.)

---

[3] An implementing federal regulation notes "participant" includes attorneys. (ICWA Proceedings, 81 Fed.Reg., *supra*, at p. 38803.) It also observes that "participants could also include the State agency, parents, the custodian, relatives or trial witnesses, depending on who is involved in the case." (*Ibid.*)

## B. California's Implementation of ICWA (Cal-ICWA)

### 1. Background of Cal-ICWA

California struggled to comply with ICWA after its passing. California Indian Legal Services (CILS),[4] one of the sponsors of the bill that became Cal-ICWA, expressed concern that "state courts and county agencies in California continue to violate not only the spirit and intent of ICWA, but also its express provisions." (Sen. Judiciary Com., Analysis of Sen. Bill No. 678 (2005–2006 Reg. Sess.) as amended Aug. 22, 2005, p. 6; see also *id.* at p. 7 [CILS noting a "myriad of appellate court decisions involving ICWA" to support contention that "social workers, courts and other parties still have difficulty complying with ICWA's requirements"].) Of particular concern was that tribes were unable "to participate in child custody proceedings because they fail to be properly notified of the proceedings." (*Id.* at p. 6.)

In 2006, the California Legislature passed Senate Bill No. 678 (2005–2006 Reg. Sess.), which "enacted provisions that affirm ICWA's purposes (§ 224, subd. (a)) and mandate compliance with ICWA '[i]n *all* Indian child custody proceedings' (§ 224, subd. (b))." (*Isaiah W., supra,* 1 Cal.5th at p. 9, italics added.) The Legislature's "primary objective" in incorporating these provisions "was to increase compliance with ICWA." (*W.B., supra,* 55 Cal.4th at p. 52; see also Sen. Appropriations Com., Analysis of Sen. Bill No. 678 (2005–2006 Reg. Sess.) as amended Aug. 22, 2005, p. 1; accord, *In re Abbigail A.* (2016) 1 Cal.5th 83, 91 (*Abbigail A.*) ["persistent noncompliance with

---

[4]     CILS is also amicus curiae in this case.

ICWA led the Legislature in 2006 to 'incorporate[] ICWA's requirements into California statutory law' "].)

### 2. *Cal-ICWA's Provisions Relating to the Duty of Inquiry*

After the federal ICWA regulations were adopted in 2016, California made conforming amendments to Cal-ICWA, including portions of the Welfare and Institutions Code related to ICWA inquiry and notice requirements. (Assem. Bill No. 3176 (2017-2018 Reg. Sess.); Stats. 2018, ch. 833, §§ 4–7; *In re A.W.* (2019) 38 Cal.App.5th 655, 662, fn. 3.) Among other things, Assembly Bill No. 3176 "revise[d] the specific steps a social worker, probation officer, or court is required to take in making an inquiry of a child's possible status as an Indian child." (Legis. Counsel's Dig., Assem. Bill No. 3176 (2017–2018 Reg. Sess.) p. 1; Stats. 2018, ch. 833.) As a result of this amendment, " 'agencies now have a broader duty of inquiry and a duty of documentation.' " (*In re Jerry R.* (2023) 95 Cal.App.5th 388, 411; § 224.2, subd. (a); see also Cal. Rules of Court, rule 5.481(a).[5])

---

[5] References to rules are to the California Rules of Court. The California Constitution directs the Judicial Council to "adopt rules for court administration, practice and procedure." (Cal. Const., art. VI, § 6, subd. (d); see § 265 [concerning rules for juvenile courts].) Rules adopted by the Judicial Council "are entitled to a measure of judicial deference." (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1014; accord, *Abbigail A., supra*, 1 Cal.5th at p. 92.)

Rule 5.481 parallels the inquiry and notice statutes of sections 224.2 and 224.3 and directs courts, court investigators, and agencies to inquire of the child, parents, "Indian custodian, or legal guardians, extended family members, others who have an interest in the child, and where applicable the party

Section 224.2 codifies and expands on ICWA's duty of inquiry to determine whether a child is an Indian child.[6] Agencies and juvenile courts have "an affirmative and continuing duty" in every dependency proceeding to determine whether ICWA applies by inquiring whether a child is or may be an Indian child. (§ 224.2, subd. (a).) This "duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (*Ibid.*; see also rule 5.481(a); *Isaiah W.*, *supra*, 1 Cal.5th at p. 14 ["juvenile court has an affirmative and continuing duty in all dependency proceedings to inquire into a child's Indian status"].)

Section 224.2, subdivision (b) specifies that once a child is placed into the temporary custody of a county welfare department, the duty to inquire "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether

---

reporting child abuse or neglect," whether the child might be an Indian child. (Rule 5.481(a)(1).) Importantly, the rule requires a petitioner in a dependency proceeding on an "ongoing basis [to] include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes. Whenever new information is received, that information must be expeditiously provided to the tribes." (Rule 5.481(a)(5).)

[6] "Indian child" is defined in the same manner under state law as federal law. (§ 224.1, subd. (a).)

the child is, or may be, an Indian child."[7]  (See also rule 5.481(a)(1).)  "Extended family member" means "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent."  (25 U.S.C. § 1903(2); see also § 224.1, subd. (c) [adopting ICWA definition of "extended family member"].)

While this duty of inquiry is sometimes referred to as the initial duty of inquiry, this is a bit of a misnomer, as the duty "continues throughout the dependency proceedings."  (*In re J.C.* (2022) 77 Cal.App.5th 70, 77 (*J.C.*); see also *In re K.H.* (2022) 84 Cal.App.5th  566,  p. 597,  fn. 10  (*K.H.*)  "[c]ourts  have recognized it is somewhat inaccurate to refer to the agency's ' " 'initial duty of inquiry' " ' "].)

When the agency has "reason to believe" that an Indian child is involved, further inquiry regarding the possible Indian status of the child is required.  (§ 224.2, subd. (e);[8] see also rule

---

[7]  We have granted review in *In re Ja.O.* (2023) 91 Cal.App.5th 672 (review granted July 26, 2023, S280572) to decide whether the inquiry duty under section 224.2, subdivision (b) applies to children taken into custody by means of a protective custody warrant (§ 340).  That issue is not before us, and we do not comment on the issue here.

[8]  The Legislature amended section 224.2, subdivision (e) in 2020 to define "reason to believe," which was previously undefined.  (Assem. Bill No. 2944 (2019–2020 Reg. Sess.) § 15, pp. 24–25, eff. Sept. 18, 2020; *K.H.*, *supra*, 84 Cal.App.5th at pp. 595–596; see *In re D.S.* (2020) 46 Cal.App.5th 1041, 1049.) "Reason to believe" means that "the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe.  Information suggesting

5.481(a)(4).) The required further inquiry includes (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs (BIA) and State Department of Social Services; and (3) contacting tribes the child may be affiliated with and anyone else that might have information regarding the child's membership or eligibility in a tribe. (§ 224.2, subd. (e)(2)(A)–(C).) At this stage, contact with a tribe "shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of [ICWA] notices," and "sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (*Id.*, subd. (e)(2)(C).)

The sharing of information with tribes at this inquiry stage is distinct from formal ICWA notice, which requires a "reason to know" — rather than a "reason to believe" — that the child is an Indian child. Unlike the term "reason to believe," a "reason to know" exists under any of the following circumstances: "(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child[;] [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village[;] [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian

---

membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated in paragraphs (1) to (6), inclusive, of subdivision (d)." (§ 224.2, subd. (e)(1).)

organization, or agency informs the court that it has discovered information indicating that the child is an Indian child[;] [¶] (4) The child who is the subject of the proceeding gives the court reason to know [he or she] is an Indian child[;] [¶] (5) The court is informed that the child is or has been a ward of a tribal court[; and] [¶] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (§ 224.2, subd. (d).)

If the inquiry establishes a reason to know an Indian child is involved, notice must be provided to the pertinent tribes. (§ 224.3, subds. (a), (b); 25 U.S.C. § 1912(a).) The notice must include enough information for the tribe to "conduct a meaningful review of its records to determine the child's eligibility for membership" (*In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 576), including the identifying information for the child's biological parents, grandparents, and great-grandparents, to the extent known (§ 224.3, subd. (a)(5)(C); see also *In re Francisco W.* (2006) 139 Cal.App.4th 695, 703 (*Francisco W.*)). "Notice to Indian tribes is central to effectuating ICWA's purpose, enabling a tribe to determine whether the child involved in a dependency proceeding is an Indian child and, if so, whether to intervene in, or exercise jurisdiction over, the matter." (*In re T.G.* (2020) 58 Cal.App.5th 275, 288 (*T.G.*).) In addition, once there is reason to know a child is an Indian child, the juvenile court must find ICWA applies and "treat the minor as an Indian child unless and until it determines that ICWA does not apply." (*In re S.H.* (2022) 82 Cal.App.5th 166, 177; see also § 224.2, subd. (i)(1).)

The juvenile court may alternatively make a finding that an agency's inquiry and due diligence were "proper and adequate," and the resulting record provided no reason to know

the child is an Indian child, so ICWA does not apply. (§ 224.2, subd. (i)(2).) Even if a court makes this finding, an agency and the court have a continuing duty under ICWA, and the court "shall reverse its determination if it subsequently receives information providing reason to believe that the child is an Indian child and order the social worker or probation officer to conduct further inquiry . . . ." (§ 224.2, subd. (i)(2).)

The juvenile court's factual finding that ICWA does not apply is "subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).) Some courts apply a straightforward substantial evidence test when reviewing the juvenile court's conclusion that ICWA does not apply. (*In re Kenneth D.* (Aug. ___, 2024, S276649) ___ Cal.5th ___, ___ [p. 12] (*Kenneth D.*).)[9] "By contrast, other courts have applied 'a hybrid substantial evidence/abuse of discretion standard, reviewing for substantial evidence whether there is reason to know a child is an Indian child, and for abuse of discretion a juvenile court's finding that an agency exercised due diligence and conducted a "proper and adequate" ICWA inquiry.' " (*Ibid.*) As it is undisputed that the Cal-ICWA inquiry in this case was inadequate, we need not decide what standard of review applies to these findings.

---

[9] In *Kenneth D.*, also filed today, we consider whether, when the statutorily required inquiry is inadequate, an appellate court may consider postjudgment evidence to conclude the error is harmless. We hold that such evidence may generally not be considered absent exceptional circumstances. (*Kenneth D.*, *supra*, ___ Cal.5th at p. ___ [p. 1].)

### C. The Conflict in the Courts of Appeal Regarding the Standard for Prejudice

Against this legal backdrop, California courts have confronted the standard for whether an error in conducting the Cal-ICWA inquiry is prejudicial. Five rules have developed with respect to this issue. At the strictest end of the conceptual spectrum for assessing prejudicial error is the presumptive affirmance rule. Under this rule, error in the initial Cal-ICWA inquiry is harmless unless a parent can demonstrate on appeal that further inquiry would lead to a different outcome. (See, e.g., *In re A.C.* (2021) 65 Cal.App.5th 1060, 1069 [" 'Where the record below fails to demonstrate and the parents have made no offer of proof or other affirmative assertion of Indian heritage on appeal, a miscarriage of justice has not been established and reversal is not required' "].)

On the opposite end of the spectrum, another line of cases holds that reversal is required if a child welfare agency's initial inquiry is deficient.[10] (See, e.g., *In re Y.W.* (2021) 70 Cal.App.5th 542, 549, 556 (*Y.W.*) [agency's failure to interview mother's biological parents, where adoptive parents knew name of biological father and had contact information for biological aunt, made it impossible to demonstrate prejudice]; see also *In re A.R.* (2022) 77 Cal.App.5th 197, 207 (*A.R.*).) Third, the court in *In re*

---

[10] Some courts view this test as treating Cal-ICWA inquiry violations as reversible per se. (See, e.g., *Dezi C., supra,* 79 Cal.App.5th at p. 783; *In re G.H.* (2022) 84 Cal.App.5th 15, 32–33 (*G.H.*); *In re E.V.* (2022) 80 Cal.App.5th 691, 698 (*E.V.*); *Y.W., supra,* 70 Cal.App.5th at p. 556.) The court in *K.H.,* however, found this characterization overstated and instead viewed these cases as laying out a rule of reversal for cases involving records so inadequate "that the error and need for reversal are 'clear.' " (*K.H., supra,* 84 Cal.App.5th at p. 618.)

*Benjamin M.* (2021) 70 Cal.App.5th 735, 744 (*Benjamin M.*) held that a defect in the Cal-ICWA inquiry is harmless unless "the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child."

Subsequently, the Court of Appeal below laid out the " 'reason to believe' rule." (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 779.) Under this rule, "an agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding." (*Ibid.*)

Last, the *K.H.* court concluded prejudice must be assessed from the context of the injury involved, which is the "failure to gather and record the very information the juvenile court needs to ensure accuracy in determining whether further inquiry or notice is required, and whether ICWA does or does not apply." (*K.H.*, *supra*, 84 Cal.App.5th at p. 591.) It noted this injury was not tied to any outcome on the merits and was therefore not amenable to the standard *Watson* likelihood-of-success test to assess prejudice. (*Id.* at p. 609.) It also held that "where the opportunity to gather the relevant information critical to determining whether the child is or may be an Indian child is lost because there has not been adequate inquiry and due diligence, reversal for correction is generally the only effective safeguard." (*Id.* at p. 610.)

### D. The Parties' Positions

Mother argues that we should adopt a reversal per se rule. She maintains an inadequate Cal-ICWA inquiry denies tribes the constitutional due process right to notice, and is therefore structural error requiring reversal per se. Mother also contends that error in conducting the statutorily required inquiry is not amenable to the regular outcome-focused likelihood-of-success test laid out in *Watson*, because the prejudice stemming from the erroneous inquiry is the very failure to obtain the information required to determine whether ICWA applies. Citing to *A.R.*, *supra*, 77 Cal.App.5th at p. 207, mother maintains that because an inadequate inquiry prejudices the rights of the parent, tribe, and child, "[r]eversal per se is the only effective safeguard of the rights ICWA was designed to protect."

Mother alternatively argues that if we do not adopt a per se reversal standard for prejudice, we should adopt the *Benjamin M.* rule, as elaborated by *K.H.* Mother notes both cases focus on the adequacy of the investigation and what an adequate inquiry might have revealed, and both reject *Watson*'s outcome-focused approach to assessing prejudice. In mother's view, "this test would require reversal in every case in which either (1) known, available relatives were not asked about possible Indian ancestry or (2) the parents were not asked if there were any such relatives who could be asked."

The Department disagrees that a per se reversal rule or the *Benjamin M.* rule should apply. It advocates for the reason-to-believe rule laid out by the Court of Appeal below. It argues that the reason-to-believe rule is consistent with the California Constitution's requirement that a judgment not be set aside unless it results in a miscarriage of justice by affecting the

outcome on the juvenile court's ICWA finding, and that this rule best reconciles competing policy considerations at play when ICWA inquiry error is asserted late in the proceedings.

### E. The Failure to Conduct an Adequate Inquiry Requires Conditional Reversal and Remand with Directions To Comply with Cal-ICWA

We hold that error resulting in an inadequate initial Cal-ICWA inquiry requires conditional reversal with directions for the child welfare agency to comply with the inquiry requirement of section 224.2, document its inquiry in compliance with rule 5.481(a)(5), and when necessary, comply with the notice provision of section 224.3. When a Cal-ICWA inquiry is inadequate, it is impossible to ascertain whether the agency's error is prejudicial. (*Y.W.*, *supra*, 82 Cal.App.5th at p. 556; see also *J.C.*, *supra*, 77 Cal.App.5th at p. 80.) "[U]ntil an agency conducts a proper initial inquiry and makes that information known, it is impossible to know what the inquiry might reveal." (*K.H.*, *supra*, 84 Cal.App.5th at p. 617; see also *Benjamin M.*, *supra*, 70 Cal.App.5th at p. 743 [until agency gathers information and makes it known "we cannot know what information an initial inquiry, properly conducted, might reveal"].)

" '[W]hen the validity of a [judgment] depends solely on an unresolved or improperly resolved factual issue which is distinct from [the judgment], such an issue can be determined at a separate post-judgment hearing and if at such hearing the issue is resolved in favor of the [agency], the [judgment] may stand.' " (*People v. Moore* (2006) 39 Cal.4th 168, 176–177; see also *People v. Minor* (1980) 104 Cal.App.3d 194, 199 ["when the trial is free of prejudicial error and the appeal prevails on a challenge which establishes only the existence of an unresolved question which

may or may not vitiate the judgment, appellate courts have, in several instances, directed the trial court to take evidence, resolve the pending question, and take further proceedings giving effect to the determination thus made"].) The limited remand procedure is also appropriate where, as here, the record is insufficient to permit a court to assess prejudice. (See, e.g., *People v. Gaines* (2009) 46 Cal.4th 172, 180–181 [erroneous denial of *Pitchess* motion where trial court failed to review records requires conditional reversal and remand to trial court with directions to review the documents and to allow defendant to demonstrate prejudice from nondisclosure if documents contain relevant information]; see also *People v. Madrigal* (2023) 93 Cal.App.5th 219, 263 [same; "[o]n this record, it is impossible to assess prejudice from the failure to disclose the subpoenaed materials because we do not know what they contain, and the trial court made no record of their contents"].)

In this case, the sole infirmity in the judgment is the failure to conduct an adequate Cal-ICWA inquiry, which renders it impossible to review for prejudice the trial court's implied finding that ICWA does not apply. There is no indication of any error in the dependency proceedings that would justify the outright reversal of the judgment terminating parental rights. Thus, full reversal of the section 366.26 judgment is not warranted; rather, a conditional reversal in order to comply with Cal-ICWA is appropriate. Indeed, conditional reversal appears to be common practice in a number of cases involving inadequate

ICWA inquiries.[11]  (See, e.g., *In re K.R.* (2018) 20 Cal.App.5th 701, 709–710 (*K.R.*).)

Upon a conditional reversal, the Department will make additional inquiry and documentation efforts consistent with its duties and the court shall hold a hearing thereafter to determine whether, in light of the outcome of the inquiry as documented, ICWA applies.  If the juvenile court determines the inquiry is proper, adequate, and duly diligent and concludes that ICWA does not apply, any inquiry error is cured, and the judgment would be reinstated.  (See *Francisco W.*, *supra*, 139 Cal.App.4th at p. 705 [noting limited reversal allows ICWA error to be cured while affording child protection of juvenile court].)  In contrast, if the inquiry reveals a reason to know the dependent child is an Indian child, the tribe has been notified (see § 224.3, subd. (a); 19 U.S.C. § 1912), and the tribe determines the child is a member or citizen, or eligible for membership or citizenship, of an Indian tribe (see § 224.1, subd. (b); 25 U.S.C. § 1903(4)), ICWA applies, and the judgment must be reversed.

We reach this conclusion for several reasons.  First, ICWA and Cal-ICWA " ' "recognize[] that the tribe has an interest in the child which is distinct from but on a parity with the interest of the parents" ' " and other relatives.  (*Isaiah W.*, *supra*, 1 Cal.5th at p. 9; see also *A.R.*, *supra*, 77 Cal.App.5th at p. 204 ["As these [statutes] make clear, the primary parties protected under ICWA are the Native American tribes, whose right to

---

[11]  The dissent mischaracterizes our conclusion as holding that an inadequate ICWA inquiry is structural error.  To the contrary, our holding today is premised on the fact that when an inquiry is inadequate, the record is insufficient to determine whether the error is harmless under *Watson*.

intervene in an appropriate case will likely never be discovered absent the statutorily required inquiry and notice procedures"].) That interest is compromised and cannot be protected if the social service agency and the juvenile court fail to perform their inquiry duties. (See *G.H.*, *supra*, 84 Cal.App.5th at p. 31.) A rule requiring conditional reversal when there is error in an ICWA inquiry acknowledges that the interest at issue belongs to tribes who "have no standing to intervene in a dependency case unless Native American ancestry is *first* uncovered and established, and thus no way of protecting their tribal interests unless child welfare agencies comply with ICWA and then notify the appropriate tribe when the inquiry reveals Native American ancestry." (*A.R.*, *supra*, 77 Cal.App.5th at pp. 201–202, italics added.) Thus, in the context of juvenile dependency appeals raising deficiencies in the ICWA inquiry, an appealing parent "is in effect acting as a surrogate for the tribe in raising compliance issues . . . ." (*K.R.*, *supra*, 20 Cal.App.5th at p. 708.) This is not a conventional scenario in which the harm from error directly and solely affects the appealing party. Conditional reversal to allow inquiry error to be cured best supports the interests of tribes, which are independently protected by ICWA.

Second, this approach best comports with the plain language of the inquiry requirements of section 224.2. As we have seen (*ante*, pt. II.B.2), Cal-ICWA "broadly imposes on social services agencies and juvenile courts (*but not parents*) an 'affirmative and continuing duty to inquire' whether a child in the dependency proceeding 'is or may be an Indian child.'" (*Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 741–742, italics added, quoting § 224.2, subd. (a); see also § 224.2, subds. (b), (c); rule 5.481(a).) "'[T]he burden of coming forward with information to determine whether an Indian child may be

involved and ICWA notice required in a dependency proceeding does not rest entirely — or even primarily — on the child and his or her family.' " (*T.G.*, *supra*, 58 Cal.App.5th at p. 293.) When an inquiry is inadequate, the entities charged with the duty to conduct the inquiry must attempt to cure that error and may not avoid their duty by placing the burden on the parents to demonstrate that the error is prejudicial on an inadequate record.

Third, "ensuring a proper, adequate, and duly diligent inquiry at the initial stage of the compliance process is foundational to fulfilling the purpose underlying ICWA and related California law." (*K.H.*, *supra*, 84 Cal.App.5th at p. 590.) ICWA was enacted to protect tribal integrity and sovereignty in its membership determinations, which is "central to its existence as an independent political community." (*Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 72, fn. 32.) "Tribal membership criteria, classifications of membership, and interpretation of membership laws are unique to each tribe and vary across tribal nations." (*In re Dependency of Z.J.G.* (2020) 196 Wn.2d 152, 176.) Accordingly, only a tribe can determine whether a child is a member of, or eligible for membership in, that tribe (25 C.F.R. § 23.108(a), (b) (2024)), and a court "may not substitute its own determination regarding a child's membership in a [t]ribe, a child's eligibility for membership in a [t]ribe, or a parent's membership in a [t]ribe." (*Id.*, § 23.108(b) (2024); accord, *Isaiah W.*, *supra*, 1 Cal.5th at p. 8.)

While the right to determine a child's Indian ancestry belongs to the tribe, at the initial inquiry stage of proceedings, "the tribe is not present, and the *agency* is charged with obtaining information to make that right meaningful." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 745, italics added.)

When an ICWA inquiry is inadequate, a child's potential Indian ancestry is missed, and tribes are prevented from making the final determination that the child is an Indian child. Conditionally reversing to conduct an adequate Cal-ICWA inquiry ensures tribes' important sovereign right to determine whether the child is a member of, or eligible for membership in, the tribe.

Amici curiae CILS and California Tribal Families Coalition (CTFC) note that as a result of forced assimilation policies, "younger generations lack[] knowledge of their Native American ancestry which may only be reclaimed by conducting [a] proper ICWA inquiry with extended family members and others more knowledgeable." (Accord, ICWA Proceedings, 81 Fed.Reg., *supra*, at p. 38780.) Recognizing that parents may not be the best source of information about a child's Indian ancestry, the Legislature expressly mandated that, from the outset, child protective agencies expand their investigation of a child's possible Indian status beyond the child's parents. (§ 224.2, subd. (b); Assem. Bill No. 3176 (2017–2018 Reg. Sess.); Stats. 2018, ch. 833, § 5.) An "agency's inquiry is often the only opportunity to collect . . . information" that the child is or may be an Indian child, and thus "is a critical step in safeguarding the rights ICWA was designed to protect and one that cannot be excused by reviewing courts." (*K.H.*, *supra*, 84 Cal.App.5th at p. 604.) "Although the duty of inquiry is a continuing one [citation], as we have seen in countless cases, . . . if the inquiry is inadequate at the outset, the likelihood that the opportunity to gather relevant information will present itself later in the proceeding declines precipitously." (*Id.* at p. 609.) As required by statute, an adequate initial inquiry that reaches beyond parents to extended family members and others facilitates the discovery of

Indian identity, and maximizes the chances that potential Indian children are discovered and tribes are notified.

Fourth, our holding is supported by the 2016 implementing regulations of ICWA, which promote "compliance with ICWA from the earliest stages of a child-welfare proceeding." (ICWA Proceedings, 81 Fed.Reg., *supra*, at p. 38779.) The regulations emphasize "[i]t is . . . critically important that there be an inquiry into that threshold issue [of whether a child is an Indian child] as soon as possible. If this inquiry is not timely, a child-custody proceeding may not comply with ICWA and thus may deny [ICWA] protections to Indian children and their families. The failure to timely determine if ICWA applies also can generate unnecessary delays, as the court and the parties may need to redo certain processes or findings under the correct standard. This is inefficient for courts and parties, and can create delays and instability in placements for the Indian child." (*Id.* at pp. 38802–38803.) A conditional reversal rule when Cal-ICWA inquiries are inadequate will encourage prompt, complete compliance with ICWA early in the proceedings and avoid delay and duplicative efforts. This will further ICWA and Cal-ICWA's goals of prompt, full compliance with their inquiry requirements, and accommodate the critical interest of dependent children in permanency and stability.

The Court of Appeal expressed concern that reversing whenever an inquiry does not satisfy the requirements of section 224.2 would result in an "endless feedback loop of remand, appeal, and remand" because the statutory duty of inquiry "creates an open-ended universe of stones," and "empowers [an appealing parent] to obtain a remand to question extended family members, then a second remand to question the family babysitter, and then a third remand to question longtime

neighbors, and so on and so on." (*Dezi C.*, *supra*, 79 Cal.App.5th at pp. 784–785.) But our conclusion does not require reversal in all cases in which every possible extended family member has not been asked about the child's Indian ancestry. As mother herself concedes, section 224.2 "does not require the agency to 'find' unknown relatives and others who have an interest in the child, merely to make reasonable inquiries. The operative concept is those people who are reasonably available to help the agency with its investigation into whether the child has any potential Indian ancestry should be asked."

Because it is undisputed that the inquiry in this case was inadequate, we do not have occasion to decide what constitutes an adequate and proper inquiry necessary to satisfy section 224.2. We note, however, that the juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is "a quintessentially discretionary function" (*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1005) subject to a deferential standard of review. (§ 224.2, subd. (i)(2); see also *Kenneth D.*, *supra*, ___ Cal.5th at p. ___ [p. 12].) " 'On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes.' " (*Kenneth D.*, *supra*, ___ Cal.5th at p. ___ [p. 13]; see also *In re H.B.* (2023) 92 Cal.App.5th 711, 721.)

If, upon review, a juvenile court's findings that an inquiry was adequate and proper and ICWA does not apply are found to be supported by sufficient evidence and record documentation as required by California law (rule 5.481(a)(5)), there is no error and conditional reversal would not be warranted even if the agency did not inquire of everyone who has an interest in the

child. On the other hand, if the inquiry is inadequate, conditional reversal is required so the agency can cure the error and thereby safeguard the rights of tribes, parents, and the child.

Here, for example, the Department's inquiry extended no further than mother and father, both of whom have longstanding issues with substance use disorder, even though their parents, siblings, and father's cousin were readily available and had been interviewed by the Department regarding the allegations of the dependency petitions. The Department's inquiry falls well short of complying with section 224.2, as it concedes. " 'When, as in this case, the court's implied finding that the agency's inquiry was proper, adequate, and duly diligent rests on a cursory record and a patently insufficient inquiry that is conceded, the only viable conclusion is that the finding is unsupported by substantial evidence and the court's conclusion to the contrary constitutes a clear abuse of discretion.' " (*Kenneth D.*, *supra*, ___ Cal.5th at p. ___ [p. 13]; quoting *K.H.*, *supra*, 84 Cal.App.5th at p. 589.)

According to our dissenting colleagues, we should overcome the inadequate record and assess the juvenile court's implied ICWA finding for prejudice by requiring the appealing parent to make a proffer to the Court of Appeal of extra-record evidence tending to show the child is Indian. Contrary to Cal-ICWA, this would improperly shift the burden of proof to the parents and improperly substitute the reviewing court's "judgment for that of the juvenile court, which is to make those findings in the first instance." (*Kenneth D.*, *supra*, ___ Cal. 5th at p. ___ [p. 15].)

In the dissent's view, since delay "of even a few months" for a juvenile court to conduct the statutorily required inquiry can impact a child, it is appropriate to admit new evidence on appeal under Code of Civil Procedure section 909. (Dis. opn. of Groban, J., *post*, at p. 6; *id.* at p. 7.) We agree with our dissenting colleagues about the importance of prompt resolution of dependency proceedings. However, if delay to comply with the statutory inquiry requirements were a basis to invoke Code of Civil Procedure section 909, the exception would swallow the rule we have laid out in *Kenneth D.* that reviewing courts may not generally consider previously unadmitted evidence for the first time on appeal to conclude initial ICWA inquiry error is harmless. (*Kenneth D., supra*, ___ Cal. 5th at p. ___ [p. 1].) As we also observe in *Kenneth D.*, " 'claims of error under ICWA are not rare and will not typically present the type of exceptional circumstances warranting deviation from the general rule' that appellate courts should not engage in factfinding." (*Kenneth D., supra*, ___ Cal.5th at p. ___ [p. 18].)

Moreover, we have never suggested that when a record is insufficient to ascertain whether error is harmless, we should require an appellant to present new, extra-record evidence pursuant to Code of Civil Procedure section 909 to demonstrate prejudice under *Watson*. None of the cases cited in the dissent allowed the introduction of new evidence on appeal to determine whether the asserted error was prejudicial. (Dis. opn. of Groban, J., *post*, at pp. 9–10.) Nor have we relied on the *absence* of evidence, or the potential for delay in finality, to justify admission of new evidence on appeal under Code of Civil Procedure section 909. It is unclear how the dissent's rationale "could be cabined to the ICWA context, as it would seem to countenance appellate courts' receipt of new evidence in *any*

case involving harmless error review, making consideration of such evidence routine rather than exceptional." (*Kenneth D.,* *supra,* \_\_\_ Cal.5th at p. \_\_\_ [p. 18].) This would contravene our decision in *Kenneth D.,* as well as our decision in *In re Zeth S.* (2003) 31 Cal.4th 396, 408, in which we rejected the routine acceptance of postjudgment evidence under Code of Civil Procedure section 909 to expedite final resolution of matters.[12]

Juvenile dependency proceedings "involve the well-being of children, [so] considerations such as permanency and stability are of paramount importance. (§ 366.26.)" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) "We emphatically agree that dependent children have a critical interest in avoiding unnecessary delays to their long-term placement." (*In re A.R.* (2021) 11 Cal.5th 234, 249.) "Because tribes have a right to intervene and even overturn prior judgments for failure to comply with ICWA [citations], the lack of timely and proper inquiry can undermine expeditious resolution and call into doubt the finality of juvenile court orders." (*Kenneth D., supra,* \_\_\_ Cal.5th at p. \_\_\_ [p. 21].)

Furthermore, it bears emphasis that "the obligation is only one of inquiry and not an absolute duty to ascertain or refute Native American ancestry." (*In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1413.) Agencies are already tasked with investigating the circumstances underlying the child's removal and identifying and locating the child's extended family members (§ 309, subds. (a), (e)); it is a rather simple task to ask

---

[12] It should also be noted that prompt, permanent placement is not the only area of critical importance for children in dependency proceedings. Complying with ICWA benefits children by furthering their interests in continued connections to their tribes and preserving their culture. (See *Isaiah W., supra,* 1 Cal.5th at pp. 7–8; 25 U.S.C. § 1902.)

those family members about Indian ancestry in this process. In fact, courts have characterized the duty of inquiry as "slight and swift." (*In re S.S.* (2023) 90 Cal.App.5th 694, 698; see also *K.H.*, *supra*, 84 Cal.App.5th at p. 619 ["we do not believe that requiring agencies and juvenile courts to ensure fulfillment of the most basic duties of inquiry required under ICWA adds measurably to" burden on agencies and courts]; *A.R.*, *supra*, 77 Cal.App.5th at p. 207 [delay in finality "need not be a significant one"].) The parties may also expedite the process of resolving inadequate Cal-ICWA inquiries by stipulating to a conditional reversal and the immediate issuance of the remittitur to give the juvenile court jurisdiction to order ICWA compliance. (See *In re Ricky R.* (2022) 82 Cal.App.5th 671, 683.) We conclude that when a Cal-ICWA inquiry is inadequate, conditional reversal to undertake the simple task of inquiry best balances the weighty interests of Indian children and tribes under ICWA on the one hand, and the interests of dependent children in permanency and stability on the other, because it ensures finality of dependency judgments. (Accord, *Isaiah W.*, *supra*, 1 Cal.5th at p. 15 [" ' "To maintain stability in placements of children in juvenile proceedings, it is preferable to err on the side of giving notice and examining thoroughly whether the juvenile is an Indian child." ' "].) In any event, when a Cal-ICWA inquiry is inadequate, a conditional reversal likely will inject far less delay than per se reversal of the entire judgment.[13]

---

[13] The dissent claims our holding ensures children "remain in prolonged legal uncertainty" and, here, delays permanent placement of Dezi and Joshua and does not serve their best interests. (Dis. opn. of Groban, J., *post*, at p. 2; *id.* at p. 27.) But it is agencies who create delays in permanency by failing to

It may be that in many cases, an adequate inquiry will reveal no reason to believe the child is Indian. The dissent notes mother's counsel conceded at oral argument that the likelihood of the tribe actually intervening and removing a child from placement is minimal.[14] ICWA and Cal-ICWA, however, make clear that the inquiry is not concerned with the outcome, but rather with the protection of tribal rights, including the tribes' right to determine whether a child is an Indian child.[15]

---

comply with their statutory obligation to conduct a prompt and adequate inquiry. To the extent the dissent worries about the effect of delays in this particular case, there is no evidence in this case that Dezi's and Joshua's placement with their paternal grandparents is at risk. As the dissent concedes, to date, the "paternal grandparents have provided a safe and stable environment and stand ready to permanently adopt them . . . ." (*Id.* at pp. 26–27.) We are also unpersuaded that adopting the dissent's rule would eliminate delays in permanency. Our rule encourages prompt compliance with ICWA and Cal-ICWA and prompt resolution of initial inquiry errors, while honoring the respective roles of the juvenile court as factfinder, and the court of appeal as reviewer of the "judgment based on the record as it existed when the trial court ruled." (*Kenneth D., supra,* ___ Cal.5th at p. ___ [p. 14].)

[14]    Even if a child is found to be Indian, but ultimately not placed with a tribe, tribal placement is not ICWA's only goal. Tribal input regarding a child's placement is also a viable goal, particularly when children are placed with foster parents who do not share the children's culture. (See, e.g., § 224.4; rules 5.690(c)(2)(C) & 5.708(f)(7).)

[15]    The dissent focuses on the outcome of the inquiry, and characterizes it as "go[ing] to the heart of ICWA . . . ." (Dis. opn. of Groban, J., *post,* at p. 14.) But as we have seen, the outcome is not for us to decide. (*Isaiah W., supra,* 1 Cal.5th at p. 8.) Notice enables the tribe to decide whether a child is Indian "and, if so, whether to intervene in or exercise jurisdiction over the

"[A]bsent a reasonable inquiry at the outset, the opportunity to gather information relevant to the inquiry is often missed entirely." (*K.H.*, *supra*, 84 Cal.App.5th at p. 615.)

It is also true that any finding the trial court makes after remand will be appealable by the parents. As we have noted, however, the juvenile court's finding regarding the adequacy of the inquiry and ICWA's applicability is subject to a deferential standard of review. Further, child welfare agencies can avoid repeated remands by conducting an adequate inquiry as soon as possible and continuing to abide by their statutory inquiry obligations throughout dependency proceedings. Moreover, while a parent will have a right to appeal from any juvenile court order updating its ICWA findings following conditional reversal, that order will not be stayed pending appeal. (§ 395, subd. (a)(1).)

The Department argues that a clear rule of reversal should be rejected because the Legislature did not require automatic Cal-ICWA appeals and did not designate tribes as real parties in interest to dependency proceedings. The fact that the Legislature has not designated specific procedural paths to ensure Cal-ICWA compliance does not mean that compliance with Cal-ICWA can be sidestepped or is unimportant. Without an adequate inquiry, tribes will not know whether a child is an

---

proceeding." (*Id.* at p. 5.) It is for that reason that the "*notice requirement is at the heart of ICWA . . . .*" (*In re Antonio R.* (2022) 76 Cal.App.5th 421, 429, italics added (*Antonio R.*).) An adequate initial inquiry at the outset is essential to ensuring that tribes are properly noticed so they may make this final determination.

Indian child and will not receive notice or have standing to intervene in dependency cases.

In sum, when an initial Cal-ICWA inquiry is inadequate, conditional reversal is warranted in order to develop the record and cure the inadequacy. This rule protects the interests of parents, children, and tribes, ensures agencies and courts are complying with their statutorily prescribed duties, and protects the permanency of dependency judgments.

### F. The Department Fails To Persuade that the Reason-to-Believe Rule Should Apply When Cal-ICWA Inquiries Are Inadequate

As we have noted, the Department argues the reason-to-believe rule announced by the Court of Appeal should be adopted because it is consistent with the California Constitution's requirement that a judgment not be set aside unless it results in a miscarriage of justice by affecting the outcome (in this case, the juvenile court's ICWA finding). The dissent also favors the reason-to-believe rule. The Department maintains this rule best reconciles competing policy considerations at play when Cal-ICWA compliance issues are asserted late in the proceedings, including: (1) the interests of dependent children in permanency, (2) the interest in effectuating the rights of Indian tribes by ensuring a determination of whether a child may be an Indian child, (3) the judicial branch's interest in ensuring that the agency gets the message that a proper initial inquiry is critical, and (4) the judicial branch's interest in discouraging parents from engaging in gamesmanship and delaying objections to the adequacy of an inquiry until parental rights have been terminated.

We reject the reason-to-believe rule as flawed. By placing the burden on parents to point to something in the record suggesting there is a reason to believe a child might be an "Indian child," the rule effectively shifts the obligation to conduct the inquiry away from child welfare agencies and courts to the parents. (See *Benjamin M.*, *supra*, 70 Cal.App.5th at p. 743; see also *In re V.C.* (2023) 95 Cal.App.5th 251, 261 [rejecting reason-to-believe rule because it "shifts the duty of developing information on Indian ancestry from the agency to the parents"].) This contravenes the Legislature's intent which, as evinced by section 224.2's plain language and legislative history, is to impose the inquiry obligation on agencies and courts in order to increase compliance with ICWA. (See § 224.2, subds. (a)–(c), (e).)

The dissent contends that shifting the burden to the parents is appropriate under *Watson*. (Dis. opn. of Groban, J., *post*, at pp. 10–11.) The dissent not only ignores that we cannot ascertain whether the error is harmless when an initial Cal-ICWA inquiry is inadequate (see *ante*, at pp. 20–22 & fn. 11), but also that the Legislature charged child welfare agencies with the obligation to conduct an adequate inquiry. It argues that Cal-ICWA contemplates parents will participate in the determination that a child is an Indian child by filling out ICWA-020 forms and notifying the court if subsequent information gives a reason to know the child is Indian. (Dis. opn. of Groban, J., *post*, at pp. 15–16.) Juvenile court forms directing parents to provide information within their possession, however, differs fundamentally from the statutory duty of inquiry, which the Legislature has expressly stated must extend beyond the parents. While the Legislature remains free to amend Cal-ICWA, the duty of inquiry, expressly placed on child

welfare agencies, cannot be shifted to the parents under the current statutory scheme.

In addition, the reason-to-believe rule assumes parents are capable of protecting tribal rights (i.e., that they have sufficient knowledge of their Indian heritage to demonstrate a reason to believe the child might be an Indian child) and are interested in doing so. The Legislature has not embraced this assumption, however, which "overlooks recent findings on the impact this country's decades-long efforts to destroy Indian families and eradicate Indian history and culture, including through abuses of the child welfare system, may have on a family's awareness of its Indian ancestry." (*In re Rylei S.* (2022) 81 Cal.App.5th 309, 321–322 (*Rylei S.*); see also ICWA Proceedings, 81 Fed.Reg., *supra*, at p. 38780.)

Indeed, there are a number of reasons why parents would not be knowledgeable of, or be uninterested in disclosing, their Indian heritage. The "[o]ral transmission of relevant information from generation to generation and the vagaries of translating from Indian languages to English combine to create the very real possibility that a parent's or other relative's identification of the family's tribal affiliation is not accurate." (*T.G.*, *supra*, 58 Cal.App.5th at p. 289.) Further, as amici curiae CILS and CTFC observe, "generations who lived through trauma at the hands of state actors pass a lack of self-identification as Native American to younger generations, leaving only the older family members or extended family members with knowledge of" Indian ancestry. (See also ICWA Proceedings, 81 Fed.Reg., *supra*, at p. 38780.) Parents may simply be estranged from, or have an unfavorable relationship with, extended family. (See, e.g., *G.H.*, *supra*, 84 Cal.App.5th at pp. 30–31.)

"[W]e also cannot assume a parent's interest necessarily aligns with the tribe's interest." (*K.H.*, *supra*, 84 Cal.App.5th at p. 613.) " 'The parents or Indian custodian may be fearful to self-identify, and social workers are ill-equipped to overcome that by explaining the rights a parent or Indian custodian has under the law.' " (*Rylei S.*, *supra*, 81 Cal.App.5th at p. 322.) This is unsurprising. "Native communities have endured a legacy of trauma at the hands of State actors who enacted forced removal and assimilation of their children; therefore, Native families are much more likely to harbor a unique distrust of government workers." (*In re Dependency of G.J.A.* (2021) 197 Wn.2d 868, 905; see also *id.* at p. 906 ["Native families often do not trust child welfare workers"].) " 'Parents may even wish *to avoid* the tribe's participation or assumption of jurisdiction.' " (*Rylei S.*, *supra*, 81 Cal.App.5th at p. 322, italics added.) They "may be less interested in or committed to federal and state policies of protecting the continued existence and integrity of tribes — even perhaps viewing potential tribal involvement consciously or unconsciously as a source of competition for custody." (*G.H.*, *supra*, 84 Cal.App.5th at p. 31; see also *Holyfield*, *supra*, 490 U.S. at pp. 37, 52 [mother gave birth outside of reservation to avoid tribal jurisdiction].) Some parents may even be victims of unscrupulous attorneys seeking to avoid adoption delays. (See *In re Bridget R.* (1996) 41 Cal.App.4th 1483, 1493.) Enforcing the requirement of an adequate inquiry only in cases in which the record affirmatively demonstrates a reason to believe the child is an Indian child decreases the likelihood that child welfare agencies will identify potential Indian children and notify tribes accordingly. As discussed above, an inadequate inquiry denies tribes the opportunity to make membership determinations and intervene in dependency actions when

appropriate. As amici curiae CILS and CTFC point out, it also results in a "bypassing of remedial requirements of the ICWA and a risk to the tribes of losing the next generation of their citizens through the [a]gency's failures."

In addition, by requiring parents to demonstrate in the record that there is a reason to believe the child is an Indian child, the reason-to-believe rule "potentially make[s] enforcement of the tribes' rights dependent on the quality of the parents' effort on appeal." (*A.R.*, *supra*, 77 Cal.App.5th at p. 207.) This is not what the statutory scheme contemplates. As we have seen, Cal-ICWA does not require parents to inquire about the child's Indian ancestry. When a child welfare agency fails to conduct an adequate inquiry, the record of the inquiry is necessarily inadequate. That deficiency may hinder a parent from supporting a claim that a reason to believe Indian ancestry exists. In any event, the duty of inquiry belongs to the agency and may not be shifted to the parent.

The Department and the Court of Appeal maintain that a rule limiting remand to cases in which there is a reason to believe a child is an Indian child "effectuates the rights of the tribes in those instances in which those rights are most likely at risk, which are precisely the cases in which the tribe's potential rights do justify placing the children in a further period of limbo." (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 782.) They also take the position that "by focusing on what is in the record rather than what is not in the record, [the reason-to-believe rule] largely sidesteps the 'how can we know what we don't know' and burden of proof conundrums that animate the automatic reversal and presumptive affirmance rules." (*Ibid.*)

These arguments improperly focus on the outcome of the inquiry — that there is a reason to believe the child is an Indian child — rather than the inquiry itself. As the *K.H.* court observed, "[b]y design, this [reason-to-believe] approach bypasses problems with the agency's and the court's discharge of their duties where the deficiencies lie in the failure to gather information at the initial stage of inquiry. [Citation.] Instead, the rule focuses on information relevant to the *next stage* in the ICWA compliance process — a need for further inquiry *if*, based on the record, there is reason to believe the child is an Indian child [citation], and on prejudice as related to the *court's* ICWA finding [citation]. However, as recent cases demonstrate, following changes in California law over the past few years, errors in the ICWA compliance process very often lie in the lack of an adequate inquiry at the outset and, as we have explained, ensuring adequacy at the outset is essential to ensuring that the protection afforded by ICWA and related law is realized." (*K.H.*, *supra*, 84 Cal.App.5th at p. 615, italics added.) The duty of inquiry is an ongoing one — even if it may also trigger further duties — and cannot be conflated with downstream compliance requirements. (§ 224.2, subd. (a); *J.C.*, *supra*, 77 Cal.App.5th at p. 77 [duty of inquiry " 'begins with the initial contact' [citation] and continues throughout the dependency proceedings"].) Stated differently, the inquiry is not outcome oriented; rather, it is geared to ensuring that tribal heritage is acknowledged and inquired about in dependency cases. Focusing on whether there is information bearing on the outcome of the inquiry *before an adequate inquiry has even been made* frustrates the purpose of ICWA and ignores that "tribes have a compelling, legally protected interest in the inquiry itself." (*A.R.*, *supra*, 77 Cal.App.5th at p. 202.)

The Court of Appeal and the Department make much of the fact that mother failed to raise ICWA and Cal-ICWA compliance issues below and denied Indian ancestry. They emphasize that the reason-to-believe rule will encourage parents to raise objections to ICWA inquiry issues earlier and discourage gamesmanship. It is unclear what a parent stands to gain by purposely withholding information regarding a child's potential Indian ancestry, or intentionally withholding an objection to an inadequate ICWA inquiry, only to raise the information or objection for the first time on appeal. Neither the Court of Appeal nor the Department identify any benefit a parent would receive from appellate delay for ICWA compliance purposes only, and generally a child's placement may not be disturbed during appeal.[16] (See *In re Caden C.* (2021) 11 Cal.5th 614, 630.)

---

[16] The dissent maintains the reason a parent would wait to raise the issue of ICWA or Cal-ICWA noncompliance until appeal is that parents will "seek to do anything they can to undo the trial court's termination of parental rights." (Dis. opn. of Groban, J., *post*, at p. 19.) The dissent views raising ICWA or Cal-ICWA error on appeal as "a logical response" to this possibility, and notes that in this case, mother objected for the first time on appeal that the agency did not comply with the duty of inquiry. (*Ibid.*) It also notes that in *S.H.*, *supra*, 82 Cal.App.5th at p. 172, a parent planned to claim Indian ancestry to delay the child's removal from the home. Appealing on the basis of ICWA or Cal-ICWA inquiry error, however, does not change the fact that parental rights have been terminated even if Indian ancestry is discovered. And the dependency process does not stop simply because a claim of Indian ancestry is raised. As the juvenile court in *S.H.* observed when making its

To be sure, if a party seeks to engage in gamesmanship to delay resolution of a case or a minor's permanency, we condemn such tactics. But there appears to be little incentive for parents to engage in such conduct in the first instance, and we will not assume parents are engaging in this tactic or that gamesmanship will occur based on our holding. Given the large number of cases to date involving patent errors with respect to Cal-ICWA inquiries, as well as legislative history expressing concerns about agencies' failures to comply with ICWA (see *ante*, at p. 10), our primary concern is to ensure those agencies — whose very job it is to conduct the inquiry — are not avoiding their duties under Cal-ICWA. (See, e.g., *E.V.*, *supra*, 80 Cal.App.5th at p. 697 ["this particular problem [of errors in required Cal-ICWA inquiries] keeps surfacing in appeals with alarming frequency"].) In addition, "we presume that counsel representing [a parent] in such an appeal would only raise nonfrivolous claims on [their] behalf." (*In re J.K.* (2022) 83 Cal.App.5th 498, 508, fn. 6.) We "also note that with regard to ICWA notices parents in dependency proceedings may be sanctioned if they 'knowingly and willfully falsif[y] or conceal[] a material fact concerning whether the child is an Indian child, or counsel[] a party to do so.' " (*Ibid.*, see also § 224.3, subd. (e).) Thus, the statutory scheme already addresses concerns regarding gamesmanship.

---

jurisdictional findings: "I am troubled . . . that the parents somehow wanted to claim Native American ancestry because somehow they [thought] they had a leg up by doing that. I don't know what they thought they would achieve by that." (*S.H.*, *supra*, 82 Cal.App.5th at p. 173.) Moreover, there is no evidence that mother raised ICWA and Cal-ICWA compliance on appeal here to forestall the termination of her parental rights.

Further, there is little indication that the unlikely concern of gamesmanship outweighs, or is on equal footing with, the critical importance of ensuring an adequate and proper inquiry. "Until the inquiry is conducted, and the issue is put to rest, the interests of the Native American tribes have not been adequately protected, and the judgment in this case would remain vulnerable to a potential collateral attack." (*A.R.*, *supra*, 77 Cal.App.5th at p. 202.) As we held in *Isaiah W.*, a parent may "challenge a finding of ICWA's inapplicability in an appeal from the subsequent order, even if [they] did not raise such a challenge in an appeal from the initial order." (*Isaiah W.*, *supra*, 1 Cal.5th at p. 6.) We justified this conclusion in part because ICWA permits its notice requirements to "be enforced *after* the issuance of an order terminating parental rights." (*Id.* at p. 13; see also 25 U.S.C. § 1914.) Accordingly, ICWA findings "are preserved for review *irrespective of any action or inaction on the part of the parent . . . .*" (*K.R.*, *supra*, 20 Cal.App.5th at p. 708, italics added.) Moreover, nothing in the statutory scheme permits the required inquiry to be halted or short circuited when a parent denies Indian ancestry.

Ultimately, the reason-to-believe rule discourages full compliance with Cal-ICWA, does not fully acknowledge the history or realities of many current-day tribal communities, and would risk undermining the legislative intent behind section 224.2.[17] An adequate initial inquiry ensures that Indian

---

[17] Approximately 110 of the 574 federally-recognized Indian tribes in the United States are in California. (See Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs, 88 Fed.Reg. 54654 (Aug. 11, 2023) [listing all tribes eligible for BIA services and

children are identified and ICWA and Cal-ICWA are applied even if tribes do not intervene in the proceedings.

For all these reasons, we reject the reason-to-believe rule. Placing the burden on an appealing parent to demonstrate in the record on appeal a reason to believe the child is an Indian child when the record's deficiency is due to the child welfare agency's inadequate inquiry undermines the statutory scheme and weakens a tribe's ability to discover and ultimately assert its interest in its children.

Last, we explain why we find the presumptive affirmance rule and the rule laid out in *Benjamin M.* unpersuasive. The presumptive affirmance rule "has been sharply criticized." (*K.H.*, *supra*, 84 Cal.App.5th at p. 612.) First, the rule contravenes our holding in *Kenneth D.* that absent exceptional circumstances, a reviewing court should not make factual findings and consider new evidence on appeal to conclude the initial inquiry error was harmless. (*Kenneth D.*, *supra*, ___ Cal.5th at pp. ___, ___ [pp. 1, 18].) The rule also "require[s] a parent to make an affirmative representation of Indian ancestry

_____

funding].) These tribes range from large to very small and have their own governmental structures and processes. (See California Tribal Court-State Court Forum, Frequently Asked Questions: Indian Tribes and Tribal Communities in California, p. 1 <https://www.courts.ca.gov/documents/TribalFAQs.pdf> [as of Aug. 19, 2024]; all Internet citations in this opinion are archived by year, docket number and case name at <http://www.courts.ca.gov/38324.htm>.) In addition, many Indians in California are from out-of-state tribes. (*Id.* at pp. 2–3.) These factors present challenges with ICWA and Cal-ICWA compliance, including notice to, and participation of, tribes, underscoring that ICWA and Cal-ICWA must be enforced regardless of tribal intervention. (See ICWA Proceedings, 81 Fed.Reg., *supra*, at pp. 38782–38783.)

where the [agency's] failure to conduct an adequate inquiry deprived the parent of the very knowledge needed to make such a claim." (*Y.W.*, *supra*, 70 Cal.App.5th at p. 556.) As the Court of Appeal below reasoned in rejecting the rule: "By placing the onus solely on the parent to come forward with a proffer of information likely to be obtained on remand, the presumptive affirmance rule not only embraces finality at the expense of the tribe's interest in ascertaining accurate determinations of the Indian status of dependent children, but does too little to incentivize agencies to conduct proper inquiries because prejudicially deficient [inquiries] will go uncorrected if the parent is unwilling or unable to make a meaningful proffer on appeal." (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 785.)

As we have seen, the rule adopted by the *Benjamin M.* court requires a court to "reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) This rule, however, is "susceptible to being read in different ways, depending on whether courts interpret it broadly or narrowly overall, and depending on how they interpret 'readily obtainable information' and 'likely to bear meaningfully' on the inquiry more specifically." (*K.H.*, *supra*, 84 Cal.App.5th at p. 617.) As a result, this rule is malleable enough to result in inconsistent outcomes. (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 786 [uncertainty and breadth of rule means reviewing courts will debate whether information is readily obtainable]; see also *In re D.B.* (2022) 87 Cal.App.5th 239, 247 [criticizing how the court in *In re Y.M.* (2022) 82 Cal.App.5th 901, 917–918 applied the *Benjamin M.* rule]; *Antonio R.*, *supra*,

76 Cal.App.5th at p. 435 [disagreeing with how *Benjamin M.* rule was applied in *In re S.S.* (2022) 75 Cal.App.5th 575 & *In re Darian R.* (2022) 75 Cal.App.5th 502].)

Moreover, the *Benjamin M.* test collapses the analysis of whether an inquiry is *adequate* into the question of whether an inadequate inquiry is *harmless*.  If a child welfare agency fails to obtain meaningful information or pursue meaningful avenues of inquiry — by, for example, failing to discover that a parent was adopted, or failing to inquire further after a parent identified an extended family member with more information about the child's potential Indian ancestry — those facts would be relevant to whether the initial Cal-ICWA inquiry is adequate, not whether the inquiry is prejudicial.  The conditional reversal rule we adopt today clearly distinguishes between the separate issues of whether an inquiry is adequate and whether inquiry error is harmless.

### G. Conclusion

It bears observing that "[t]he required inquiry here could have been conducted in significantly less time than it took to defend this appeal."  (*A.R.*, *supra*, 77 Cal.App.5th at p. 202.) Congress and the Legislature have committed to protecting Native American heritage and cultural connections between tribes and children of Native American ancestry.  (§ 224; 25 U.S.C. § 1902.)  We hold our child welfare agencies and courts to these commitments.  We do so by requiring a judgment to be conditionally reversed when error results in an inadequate Cal-

ICWA inquiry. It is only by conditionally reversing that we can ascertain whether error in the inquiry is prejudicial.[18]

### III. DISPOSITION

The Court of Appeal's judgment is reversed with directions to conditionally reverse the order terminating parental rights. The matter is remanded to the juvenile court for compliance with the inquiry and notice requirements of sections 224.2 and 224.3 and the documentation provisions of rule 5.481(a)(5), consistent with this opinion. If the juvenile court thereafter finds a proper and adequate further inquiry and due diligence has been conducted and concludes ICWA does not apply (§ 224.2, subd. (i)(2)), then the court shall reinstate the order terminating parental rights. If the juvenile court concludes

---

[18] Because they have reached contrary conclusions on the issue before us, we disapprove *In re A.C.*, *supra*, 65 Cal.App.5th 1060, *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, *In re Benjamin M.*, *supra*, 70 Cal.App.5th 735, *In re Samantha F.* (2024) 99 Cal.App.5th 1062, *In re V.C.*, *supra*, 95 Cal.App.5th 251, *In re Ricky R.*, *supra*, 82 Cal.App.5th 671, *In re S.S.*, *supra*, 75 Cal.App.5th 575, *In re Darian R.*, *supra*, 75 Cal.App.5th 502, *In re A.C.* (2022) 75 Cal.App.5th 1009, *In re Y.M.*, *supra*, 82 Cal.App.5th 901, *In re Adrian L.* (2022) 86 Cal.App.5th 342, *In re D.B.*, *supra*, 87 Cal.App.5th 239, *In re Ezequiel G.*, *supra*, 81 Cal.App.5th 984, *In re G.A.*, *supra*, 81 Cal.App.5th 355, *In re Allison B.* (2022) 79 Cal.App.5th 214, *In re A.M.* (2020) 47 Cal.App.5th 303, *In re Austin J.* (2020) 47 Cal.App.5th 870, and *In re M.M.*, *supra*, 81 Cal.App.5th 61 to the extent they are inconsistent with our opinion.

ICWA applies, then it shall proceed in conformity with ICWA and California implementing provisions. (See 25 U.S.C., § 1912, subd. (a); §§ 224.2, subd. (i)(1); 224.3, 224.4.)


**EVANS, J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**

In re DEZI C.

S275578


Concurring Opinion by Justice Kruger


California law implementing the federal Indian Child
Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) imposes an
"affirmative and continuing duty" on a court and relevant
agencies to inquire as to whether a child in a dependency
proceeding "is or may be an Indian child." (Welf. & Inst. Code,
§ 224.2, subd. (a).) Depending on the results of this initial
inquiry, the relevant authorities may then have an obligation to
conduct further inquiry to determine whether the child falls
within the ambit of the federal ICWA and its California
counterpart (Cal-ICWA). (Welf. & Inst. Code, § 224.2, subd. (e);
see also *id.*, subd. (g).)

This case raises an important question concerning Cal-
ICWA's initial inquiry requirement. But because the parties
have conceded for purposes of this case that the agency failed to
perform an adequate initial inquiry, the sole issue before us is
"a narrow one: whether a child welfare agency's failure to make
a proper inquiry under California's heightened ICWA
requirements constitutes reversible error." (Maj. opn., *ante*, at
p. 6.) The majority holds that where a child welfare agency
failed to make an adequate initial inquiry, a reviewing court
must conditionally reverse the juvenile court's order
terminating parental rights and remand with instructions to the
juvenile court to comply with Cal-ICWA's notice and inquiry
requirements. (Maj. opn., *ante*, at pp. 21–22.)

1

I join the majority in concluding that this rule of conditional reversal follows from the statutory scheme the Legislature set forth in Welfare and Institutions Code section 224.2. I write separately, however, to express my agreement with part II of the dissenting opinion on the threshold question of what constitutes an adequate initial inquiry under Cal-ICWA. Although this question is not squarely presented here, I think it is important to be clear on certain points for purposes of deciding the issue that is currently before us. Specifically, Cal-ICWA does not, as some have assumed, require the juvenile court to leave no stone unturned in an " 'open-ended universe of stones,' " thereby creating ever-widening circles of mandatory inquiry. (Dis. opn. of Groban, J., *post*, at p. 23; accord, maj. opn., *ante*, at pp. 26–27.) Rather, fairly read, the statute requires an initial inquiry that is adequate to reach a reliable conclusion about the applicability of ICWA. This explains why the rule of conditional reversal the majority adopts today will not, as the Court of Appeal had feared, lead to endless rounds of remands for additional inquiry with little or no chance of yielding pertinent information. With this understanding in mind, I agree with my colleagues that the rule the majority announces today makes sense of the Legislature's careful efforts to balance the vital interests at stake in this case and others like it. (Maj. opn., *ante*, at p. 31; accord, dis. opn. of Groban, J., *post*, at pp. 25–26.)

**KRUGER, J.**

**I Concur:**
**CORRIGAN, J.**

2

In re DEZI C.

S275578


Dissenting Opinion by Justice Groban


Prompt and permanent placement of a child in dependency proceedings is critically important. (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1081–1082 (*Christopher L.*).) The statutory scheme makes clear that courts must "give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (Welf. & Inst. Code, § 352, subd. (a)(1) [describing the related context of when a court may grant a continuance].) After reunification efforts have failed, courts must act "reasonably promptly to minimize the time during which the child is in legal limbo. A child has a compelling right to a stable, permanent placement that allows a caretaker to make a full emotional commitment to the child." (*In re Celine R.* (2003) 31 Cal.4th 45, 59 (*Celine R.*).) "[L]engthy and unnecessary delay in providing permanency for children[ is] the very evil the Legislature intended to correct." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310 (*Marilyn H.*).) Indeed, we have said that even a four-month delay "may not seem a long period of time to an adult, it can be a lifetime to a young child." (*Ibid.*)

I agree with the majority that the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and California's version of ICWA (Cal-ICWA; Welf. & Inst. Code, § 224 et seq.) protect vital tribal interests. But the majority's rule of automatic conditional reversal where there has been a failure to comply with Cal-ICWA, even if the parents disclaim any tribal membership and even if

there is little possibility that the child may be Indian, fails to balance the equally important goal of achieving a prompt and stable placement for children in crisis. The majority opinion ensures that siblings Dezi C. and Joshua C., and hundreds of other children like them, will remain in prolonged legal uncertainty about who their adoptive parents will be, where they will live, where they will go to school, and whether they will be separated from one another and placed in separate homes. The majority forces Dezi C. and Joshua C. and their paternal grandparents to live with continued uncertainty about their future, even though the record reflects that the grandparents have consistently "provide[d] a safe and stable home environment for Dezi and Joshua," even though the parents have both previously indicated on multiple occasions and under penalty of perjury that they have no Indian ancestry, and even though, as mother's counsel conceded at oral argument, the likelihood of a tribal placement is "minimal." This delay and uncertainty carry the risk of creating further distress and instability for children who have already experienced the trauma of being permanently removed from their parents' care. This delay may also result in prospective adoptive parents deciding to no longer make themselves available as adoptive parents. I dissent to explain why our well-established standard of review for harmlessness of state law error is appropriate, one that allows lower courts to balance the goals of ICWA and Cal-ICWA with the goals of prompt and stable placement for children.

I also write to highlight that the majority does not foreclose — and indeed quite rightly expressly leaves room for — an alternate route that gives appellate courts greater flexibility going forward. Even though the majority, wrongly in my view, adopts a rule requiring automatic conditional reversal when there is error in conducting a Cal-ICWA inquiry, this does not prevent

appellate courts from giving substantial deference to a juvenile court's finding that the inquiry was, in fact, adequate. Though my colleagues deprive appellate courts from taking a commonsense approach where there was a failure to comply with Cal-ICWA at the trial level, appellate courts can still continue to show substantial deference to a juvenile court's finding that the inquiry *actually complied with* Cal-ICWA.

## I.  Standard of Prejudice for Cal-ICWA Error

The parties agree that the juvenile court complied with federal ICWA, but not Cal-ICWA. Though the majority largely ignores this distinction, the difference is crucial. Under federal ICWA, the court must ask both participants (i.e., the parents) at the commencement of proceedings "whether the participant knows or has reason to know that the child is an Indian child." (25 C.F.R. § 23.107(a) (2021).)  *That happened here.*  Prior to the initial detention hearing both parents signed under penalty of perjury ICWA-020 forms indicating that they do not have Indian ancestry. The court then confirmed with the parents at the initial detention hearing that they did not have Indian ancestry. Thus, the Department of Children and Family Services (Department) and juvenile court satisfied the federal ICWA's inquiry requirements. (25 C.F.R. § 23.107(a) (2021).)

The requirements of *Cal-ICWA*, however, impose additional duties of inquiry on a child welfare department, which "includes, but is not limited to," not just asking the parents about Indian ancestry, but also asking the child, the "legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (Welf. & Inst. Code, § 224.2, subd. (b).)  In this case, the parties agree the inquiry was

3

inadequate under Cal-ICWA because the Department and the court did not ask extended family members, meaning adults who are "the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent" (25 U.S.C. § 1903(2); Welf. & Inst. Code, § 224.l, subd. (c)), about Indian ancestry.[1]

Where there has been a violation of state law, the standard of review has been well established for almost 70 years: Under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), reversal is appropriate only where the petitioner can show that "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.* at p. 836.) As we explained in *Watson*, this standard is consistent with our constitutional mandate that "[n]o judgment shall be set aside . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; see *In re Jesusa V.* (2004) 32 Cal.4th 588, 624 (*Jesusa V.*) ["We typically apply a harmless-error analysis when a statutory mandate is disobeyed, except in a narrow category of circumstances when we deem the error reversible per se. This practice derives from article VI, section 13 of the California Constitution"].) The majority offers no plausible explanation as to

---

[1]     We have granted review in *In re Ja.O.* (2023) 91 Cal.App.5th 672, review granted July 26, 2023, S280572, to decide whether the inquiry duty under Welfare and Institutions Code section 224.2, subdivision (b) applies to children taken into custody by means of a protective custody warrant (Welf. & Inst. Code, § 340). That issue is not presented in this case, and I express no view on it here. In this case, the parties do not dispute that Cal-ICWA applies.

why *Watson* does not apply. Nor does the majority make any attempt to reconcile article VI, section 13 of the California Constitution with its decision. (See *In re Dezi C.* (2022) 79 Cal.App.5th 769, 785 (*Dezi C.*) [The majority's "automatic reversal rule seemingly elevates ICWA above the *constitutional* mandate that reversal is only required when there would be a miscarriage of justice. But it is well settled that constitutional provisions trump statutory law, not the other way around"].)

I would not so lightly dispense with our precedent or our Constitution. Instead, I would apply *Watson* in this case by adopting the Court of Appeal's "reason to believe" standard. (See *Dezi C.*, *supra*, 79 Cal.App.5th at p. 779.) Under the "reason to believe" standard, "an agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding. For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal." (*Ibid.*) This standard appropriately balances the interests of the child in avoiding delay and instability in permanent placement while at the same time requiring reversal if a threshold showing can be made that further ICWA or Cal-ICWA inquiry would be useful. But it avoids condemning children to further delay and instability in cases where there is zero evidence that the child is Indian. "By limiting a remand for further inquiry to those cases in which the record gives the reviewing court a reason to believe that the remand may undermine the juvenile court's ICWA finding, the 'reason to believe' rule effectuates the rights of the tribes in those instances in which those rights are most likely at risk, which are

precisely the cases in which the tribe's potential rights do justify placing the children in a further period of limbo." (*Dezi C.*, at pp. 781–782.)

The majority asserts that it is not holding that an inadequate inquiry is structural error, but rather that the record is insufficient when the inquiry is inadequate to determine whether the error is harmless under *Watson*. (Maj. opn., *ante*, at p. 22, fn. 11.) Though I agree with the majority that "the juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' (*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1005) subject to a deferential standard of review" (*id.* at p. 27; see pt. II, *post*), I simply do not understand the majority's assertion that it is not applying a structural error standard in instances where the Cal-ICWA inquiry is, in fact, deemed inadequate. What the majority is doing is clear: in every case where there has been an inadequate inquiry under Cal-ICWA, the majority finds the *Watson* prejudice standard inapplicable, and instead concludes that reversal is required without any attempt to assess prejudice. That is the very essence of a structural error standard.

The majority also argues that it is "impossible to review for prejudice the trial court's implied finding that ICWA does not apply." (Maj. opn., *ante*, at p. 21.) However, here and in *In re Kenneth D.* (August 19, 2024, S276649) ___ Cal.5th ___ (*Kenneth D.*), the majority also rightly acknowledges that Code of Civil Procedure section 909 allows for the submission of postjudgment evidence in exceptional circumstances. (See *Kenneth D.*, at p. ___ [p. 22].) This situation clearly fits the bill: where a delay of even a few months "can be a lifetime to a young child" (*Marilyn H.*, *supra*, 5 Cal.4th at p. 310), then it is appropriate to ask parents to come forward with at least some information showing that there would

be a reason to justify further delay. This requirement need not be onerous — if a parent can proffer any document, or any declaration, tending to show that the child might be Indian, then this would likely be sufficient to require reversal so that further inquiry can be made. But this is the very common sense and practical solution that my colleagues in the majority refuse to embrace. If we are going to delay permanent placement for a child who has already been through an unimaginable trauma — the loss of one or both of his parents as permanent caregivers — we should make sure that there is at least a glimmer of hope that such delay might be beneficial. Imagine a situation on appeal, like this one, where the parents have already submitted signed ICWA forms indicating that they have no Indian ancestry and confirmed as much to the juvenile court. And imagine a situation, like here, where the parents have not adduced one iota of evidence on appeal that they or their children are members of, or eligible for membership in, a federally recognized Indian tribe. Now assume that, after the juvenile court order was final, the Department spoke to all the people required under Cal-ICWA and presented declarations on appeal in which each of these persons stated the child had no Indian ancestry. Would the majority still require reversal? I fear the answer is "yes."

The majority worries that if the interpretation advocated for here were adopted "the exception would swallow the rule we have laid out in *Kenneth D.* that reviewing courts may not generally consider previously unadmitted evidence for the first time on appeal to conclude initial ICWA inquiry error is harmless." (Maj. opn., *ante*, at p. 29, citing *Kenneth D., supra,* ___ Cal.5th at p. ___ [p. 1].) But the facts of these two cases allay this concern. In *Kenneth D.*, the memorandum from the Placer County Department of Health and Human Services presented for postjudgment review

7

contained conflicting hearsay statements concerning Indian ancestry: "Kenneth D.'s father 'stated that he thought he might have Cherokee ancestry out of Oklahoma' while the paternal grandmother stated the father's statement was 'not accurate' and that she was 'unaware of any Native American Heritage.'" (*Kenneth D.*, *supra*, ___ Cal.5th at p. ___ [p. 1] (conc. opn. of Groban, J.).) On this record, there simply was no basis to conclusively determine that the child was not of Indian descent. The circumstances in *Kenneth D.* simply were not "'exceptional.'" (*Ibid.*) Conversely, here, as described, both parents signed ICWA forms under penalty of perjury indicating that they did not have Indian ancestry and the court then confirmed with the parents at the initial detention hearing that they did not have Indian ancestry. Code of Civil Procedure section 909 exists for exactly these kinds of exceptional cases and our Courts of Appeal are well equipped to distinguish between unexceptional fact patterns like *Kenneth D.* and exceptional cases like the one presented here.

The majority offers a variety of other reasons for requiring automatic conditional reversal, stating that "Cal-ICWA 'broadly imposes on social services agencies and juvenile courts (*but not parents*) an "affirmative and continuing duty to inquire"'" (maj. opn., *ante*, at p. 23, original italics); "ICWA was enacted to protect tribal integrity and sovereignty" (*id*. at p. 24); adequate initial inquiry "maximizes the chances that potential Indian children are discovered and tribes are notified" (*id*. at p. 26); and that the ICWA implementing regulations state that early inquiry is "'critically important'" (*ibid.*). These arguments redound to: "Because we think Cal-ICWA is a very important piece of legislation, and because we think a state actor failed in its duty to follow the law, we are going to require automatic conditional reversal when the statute is violated." But until today, it had been our longstanding

practice to inquire, in accordance with our state Constitution (Cal. Const., art. VI, § 13), whether the violation of a directory statute was prejudicial. (*In re R.L.* (2016) 4 Cal.App.5th 125, 143 [when "a statute does not provide any consequence for noncompliance, the language should be considered directory rather than mandatory"]; *In re C.T.* (2002) 100 Cal.App.4th 101, 111.) "Only in a 'very limited class of cases' has the Court concluded that an error is structural, and 'thus subject to automatic reversal' on appeal." (*Greer v. United States* (2021) 593 U.S. 503, 513.) The majority's resolution of this appeal ignores the way we and lower courts have applied *Watson* in literally thousands of cases.

In every *Watson* case, an important interest is at stake (see cases below involving the rights of a criminal defendant to admit evidence at trial; cases involving the right of a criminal defendant to have a properly instructed jury; and cases involving the statutory right to counsel) and in every case, a state actor has failed to comply with state law. But we do not adopt the automatic reversal rule applied here. Instead, for state law error, we have, for almost seven decades, quite logically gone on to ask if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836; see, e.g., *People v. Lewis* (2021) 11 Cal.5th 952, 973 [*Watson* applies to trial court's failure to appoint counsel in hearing on resentencing petition as required by statute]; *People v. Sivongxxay* (2017) 3 Cal.5th 151, 187 [*Watson* applies when the trial court fails to expressly reference the special circumstance allegation in the jury trial waiver colloquy or otherwise fails to seek a separate waiver regarding the allegation, as required by statutes construed in *People v. Memro* (1985) 38 Cal.3d 658, 704]; *People v. Anzalone* (2013) 56 Cal.4th 545, 555 [*Watson* applies to trial court's failure to ask jury foreperson to

affirm verdict as required by Pen. Code § 1149]; *People v. Gutierrez* (2009) 45 Cal.4th 789, 828 [*Watson* applies if the trial court erroneously fails to admit evidence that a victim was the initial aggressor]; *People v. Crayton* (2002) 28 Cal.4th 346, 365 [*Watson* applies to whether an unrepresented defendant would have invoked the right to counsel had he or she been readvised of this right at arraignment, as is required under Pen. Code § 987, subd. (a)]; *People v. Breverman* (1998) 19 Cal.4th 142, 148–149 [*Watson* applies if a trial court has not complied with its sua sponte duty to instruct on all lesser necessarily included offenses supported by the evidence].)

For illustration, in instructional error cases like *Breverman*, this means that we determine what we think the jury would have concluded had it possessed information that was never imparted to it. In cases like *Gutierrez*, we applied *Watson*, even though the jury never heard evidence in the defendant's favor that it should have. Moreover, though this arises in a different context, courts routinely apply a prejudice analysis when an attorney has failed to notify a client of immigration consequences resulting from the plea. (*People v. Vivar* (2021) 11 Cal.5th 510, 529 (*Vivar*).) We do not find the error to be structural, but instead require the defendant to affirmatively come forward with evidence that the plea would be different. (*Ibid.*) Similarly, though again arising in a different context, we routinely apply a prejudice analysis when foreign nationals are not informed, pursuant to the Vienna Convention, of their right to consular notification within two hours of arrest, booking, or detention. (*People v. Vargas* (2020) 9 Cal.5th 793, 832 (*Vargas*).)

While the majority asserts that the "reason to believe" rule is flawed because it "effectively shifts the obligation to conduct the inquiry away from child welfare agencies and courts to the parents"

(maj. opn., *ante*, at p. 35), this is how *Watson* works: even in the face of a blatant and admitted error by a state actor that violated the party's rights, the party still must show that the error made a difference in the outcome. And, in many of these cases requiring a showing of prejudicial error, the party relies on evidence in the record or actually attempts to come forward with new evidence to show prejudice. (See *Vivar*, *supra*, 11 Cal.5th at p. 530 ["In a declaration submitted with his [Penal Code] section 1473.7 motion, Vivar claims he would never have entered this plea had he understood that it would require his deportation"]; *Vargas*, *supra*, 9 Cal.5th at p. 834 [finding defendant had not demonstrated prejudice on a claim, based on evidence presented in a new trial motion, that he was denied due process of law for consular notification violations].) I suppose we could have quite easily concluded in countless of these cases that automatic reversal was required because the statute that was violated " 'broadly imposes' " a duty on the state actor (maj. opn., *ante*, at p. 23); we could have highlighted that the burden to act was imposed on the state and not upon the party (*ibid.*); we could have noted that requiring compliance with the statute that was violated is " 'foundational to fulfilling [its] purpose' " (*id.* at p. 24); and we could have cited to implementing regulations that stated that compliance with the statute is " 'critically important' " (*id.* at p. 26). But that is not what our Constitution requires. (See Cal. Const., art. VI, § 13 ["No judgment shall be set aside . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"].) Where a state law has been violated, article VI, section 13 makes clear that we do not automatically reverse the judgment, but that we instead ask whether "it is reasonably probable that a result more favorable to the appealing party would have been

reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d 818 at p. 836; see Cal. Const., art. VI, § 13.) In this way, the majority's automatic conditional reversal rule constitutes a significant departure from our precedent.

The majority attempts to distinguish these cases that require a showing of prejudice by noting that "[n]one of the cases cited in the dissent allowed the introduction of new evidence on appeal to determine whether the asserted error was prejudicial." (Maj. opn., *ante*, at p. 29.) First, it is noteworthy that, in some of these cases, though the evidence was not presented for the first time on appeal, the court did use evidence that was submitted only *after* the trial had concluded in order to determine whether there was prejudicial error. (See *Vivar*, *supra*, 11 Cal.5th at p. 530 [relying upon a declaration submitted with the Pen. Code, § 1473.7 motion]; *Vargas*, *supra*, 9 Cal.5th at p. 834 [relying upon evidence presented in a new trial motion].) Second, in most cases applying *Watson*, we assess prejudice without even permitting the petitioner to submit additional evidence. I do not understand how affording the petitioner the opportunity to produce postjudgment evidence makes the *Watson* standard *less* appropriate here. If anything, allowing a petitioner the right to introduce postjudgment evidence that might support petitioner's position — and requiring the petitioner make only a minimal showing in order to obtain a remand — makes this case an even better candidate for *Watson* review than most. Third, we are not just considering the application of *Watson*, but the California Constitution as well. The majority does not plausibly explain why the mere possibility that an appellate court could invoke Code of Civil Procedure section 909 means that we can now set aside judgments without applying a prejudice analysis. (Cal. Const., art. VI, § 13.)

The majority's conclusion is all the more confounding because we have routinely rejected claims that other state statutory violations in dependency proceedings constitute structural error, explaining that the interest in providing an expedited proceeding to resolve the child's status without further delay "would be thwarted if the proceeding had to be redone without any showing the new proceeding would have a different outcome." (*Jesusa V.*, *supra*, 32 Cal.4th at p. 625.) We stated that "the price that would be paid [by treating error as structural], in the form of needless reversals of dependency judgments, is unacceptably high in light of the strong public interest in prompt resolution of these cases so that the children may receive loving and secure home environments as soon as reasonably possible." (*In re James F.* (2008) 42 Cal.4th 901, 918; see also *In re A.R.* (2021) 11 Cal.5th 234, 249 ["We emphatically agree that dependent children have a critical interest in avoiding unnecessary delays to their long-term placement"]; *Christopher L.*, *supra*, 12 Cal.5th at p. 1081 ["[I]n the dependency context, automatic reversal for errors that do not invariably lead to fundamental unfairness would exact a particularly steep cost. 'There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current "home," under the care of his parents or foster parents, especially when such uncertainty is prolonged' "].)

As we said in *Celine R.* in the context of a failure to appoint separate counsel for siblings in an adoption proceeding: "We add another reason criminal cases [and per se reversal] are inapt. In a criminal case, reversal of a criminal judgment is virtually always in the defendant's best interest. The situation in a dependency case is often different. Reversal of an order of adoption, for example, might be *contrary* to the child's best interest because it would delay and might even prevent the adoption. . . . The delay an appellate

13

reversal causes might be contrary to, rather than in, the child's best interests. Thus, a reviewing court should not mechanically set aside an adoption order because of error in not giving that child separate counsel; the error must be prejudicial under the proper standard before reversal is appropriate." (*Celine R., supra*, 31 Cal.4th at p. 59, original italics.) The majority does not explain its departure from our numerous decisions reaffirming that *Watson*'s standard of review applies to dependency proceedings.

The majority also justifies its automatic reversal rule because ICWA protects the rights of *non*parties, i.e., the tribe. (Maj. opn., *ante*, at p. 24.) But the entire scheme at play here is structured so that other entities — the parents, the Department, and the court — seek to vindicate the rights of the tribe through adequate inquiry. We do not change any of the other applicable rules, e.g., what evidence is admissible, the burden of proof, the relevant statutory deadlines, simply because the rights of a third party (the tribe) may be implicated. The rules are what the rules are. It therefore seems very strange to conclude that though *Watson* has typically provided the standard of review for state law error for almost 70 years, we will dispense with *Watson* because a Cal-ICWA violation might implicate the rights of a non-party. This is especially odd since the *Watson* standard is routinely applied when the rights of a criminal defendant have been violated. Are we prepared to hold that where the statutory rights of a criminal defendant are violated, harmless error review is appropriate, but where the rights of a third-party in a non-criminal proceeding are implicated, then automatic reversal is required? Apparently so.

The majority concedes that it is not "concerned with the outcome" of the inquiry, i.e., whether the child is or may be an Indian child. (Maj. opn., *ante*, at p. 32; see also *id*. at pp. 38–39.) However, the outcome of the inquiry goes to the heart of ICWA,

which, as the majority also emphasizes, is designed " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . .' " (Maj. opn., *ante*, at p. 7, quoting 25 U.S.C. § 1902.) Determining whether the child is or may be an Indian child is a critical step to protecting " 'the best interests of Indian children' " and to promoting " 'the stability and security of Indian tribes and families.' " (*Ibid.*)

Though the majority resists requiring parents to affirmatively come forward with information on appeal involving their Indian ancestry, the entire ICWA structure places affirmative requirements upon parents to assist the court in establishing Indian ancestry. "Because early identification of Indian children is critical to ICWA's proper implementation, we believe the statute must be interpreted in a way that requires *all* participants — child protective agencies, the parents, all counsel, and the juvenile courts — to work together to determine whether children are Indian children." (*In re Ezequiel G., supra,* 81 Cal.App.5th at p. 1002 (*Ezequiel G.*).) "[P]arents are required at their first appearances to fill out ICWA-020 forms in which they declare their Indian status under penalty of perjury, and they are instructed that if they get new information, they must 'let [their] attorney, all the attorneys on the case, and the social worker . . . know immediately.' " (*Id.* at p. 1003, citing Judicial Council of Cal., Form ICWA-020 [rev. Mar. 25, 2020].) Cal-ICWA also requires parents, per court instruction, to notify the court if they receive subsequent information that provides a reason to know the child is an Indian child. (Welf. & Inst. Code, sec. 224.2, subd. (c).) Simply put,

15

"requiring *all parties* to actively participate in the ICWA inquiry is critical to ensuring that an adequate ICWA investigation is conducted and Indian children are promptly identified at the earliest possible stages of dependency cases." (*Ezequiel G.*, at p. 1003, italics added.) Mandating conditional reversal based on a parent's claim of Cal-ICWA inquiry errors, raised for the first time on appeal and without requiring the parent to present any evidence that the child is or may be an Indian child, "has precisely the opposite effect." (*Ibid.*)

The majority also offers a series of speculative reasons for rejecting the "reason to believe" rule: the parents' knowledge of their ancestry may be hampered by translation issues from Indian languages to English (maj. opn., *ante*, at p. 36); parents may be fearful to self-identify and social workers may be ill-equipped to address these fears (*id.* at p. 37); the parents may view the tribe as competition for custody (*ibid.*); and the parents may be represented by unscrupulous attorneys (*ibid.*). This strikes me as a lot of conjecture about why the parents may be ill-equipped to know if they have Indian ancestry without a word of discussion about whether delay and uncertainty will have a negative impact on the child.[2] It also fails to explain why

---

[2]     The majority opinion improperly relies on assertions from *In re Rylei S.* (2022) 81 Cal.App.5th 309, 322, which originate in the California ICWA Compliance Task Force's 2017 report to the California Attorney General's Bureau of Children's Justice (Task Force Report). (See maj. opn., *ante*, at p. 37.) This is improper because we *denied* mother's request to take judicial notice of this report, and for good reason. It is not properly subject to judicial notice and was created by "an independent, tribally led entity." (Task Force Report, p. 1.) Unable to quote from the report itself, the majority instead simply quotes from a

parents would be fearful of self-identification during juvenile court proceedings — but not on appeal.

It is of course *possible* that unscrupulous attorneys may represent a parent in a dependency proceeding, or a competent translation may not be obtained in a specific case. But what we do know for sure is that the majority's rule of automatic conditional reversal will *always*, in every single case of reversal, result in a delayed permanent placement for children who have already experienced a great deal of trauma. Delaying permanency for children — leaving them in legal limbo about where they will live, who will raise them, where they will go to school, and whether they will be separated from siblings — will now occur in 100 percent of cases where a child welfare department fails to comply with Cal-ICWA. And this automatic reversal will occur without any inquiry at all regarding whether such delay would actually be in the best interest of the child. "A conditional reversal (or affirmance) of such orders inevitably delays an adoption from proceeding, and in some cases, it may throw an adoption off track entirely if the prospective adoptive family cannot tolerate further delay. In both scenarios, the uncertainty caused by California's ICWA-related statutes negatively affects children who deserve permanence without

---

case that quotes from the improperly noticed report. This strikes me as inappropriate. Moreover, even had we taken judicial notice of this report, it bears repeating that "matters of which judicial notice is taken are considered only for their existence, not for the truth of the matters asserted in them." (*In re Marriage of Forrest & Eaddy* (2006) 144 Cal.App.4th 1202, 1209; see *Guarantee Forklift, Inc. v. Capacity of Texas Inc.* (2017) 11 Cal.App.5th 1066, 1075 ["we generally do not take judicial notice of the truth of the matter asserted in such documents"].) The majority opinion violates this settled rule.

undue delay." (*In re H.V.* (2022) 75 Cal.App.5th 433, 442, fn. 5 (dis. opn. of Baker, J.) (*H.V.*).) In fact, "[i]n just the last 12 months, [an automatic reversal] approach to asserted ICWA [and Cal-ICWA] error has resulted in, by our count, appellate courts returning more than 100 dependency cases to the juvenile courts with directions to conduct further ICWA [and Cal-ICWA] inquiries *after* parental rights were terminated. At best, these reversals significantly delay entry of final judgments releasing children for adoption; at worst, they may result in potential adoptive parents deciding not to adopt." (*Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 1001.)[3] I do not understand why we should adopt a rule (automatic conditional reversal) that will *always* create this negative outcome (delay in permanent placement) simply because other problems (like translation issues) *could* arise. The flexible approach adopted by the Court of Appeal accounts for this problem while also comporting with our traditional harmless error standard of review, but the majority errantly, in my view, refuses to embrace it. This refusal is

---

[3] The majority takes solace in the fact that "there is no evidence in this case that Dezi's and Joshua's placement with their paternal grandparents is at risk." (Maj. opn., *ante*, at p. 32, fn. 13.) This may be so, but it seems to undervalue the psychological uncertainty placed upon children and their families by the fact that the placement remains temporary and could be undone by a subsequent court determination. And, though the paternal grandparents in this case may be unwavering heretofore in their commitment to permanently adopt these children, today's ruling will sweep much more broadly than just the case of Dezi C. and Joshua C. Other prospective placements, especially in cases where the adoptive parents are not related to the children, may be far more reticent to create lasting bonds, with the prospect of losing the children looming overhead for years on end.

especially heartbreaking given that counsel for appellant mother conceded during oral argument that "the likelihood of the tribe actually intervening and removing a child from placement are very, very, not non-existent, but minimal."

Finally, the majority rejects out of hand the notion that a parent may seek to delay termination of parental rights by waiting until appeal to argue that the ICWA or Cal-ICWA inquiry was inadequate. Counsel for appellant mother argues that appellants can do just that and may assert such error on appeal without having raised the issue previously. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 6, 9, 14–15.) The majority repeatedly asserts that it is "unclear what a parent stands to gain" from waiting to raise the issue and "there appears to be little incentive for parents to engage in such conduct in the first instance." (Maj. opn., *ante*, at pp. 40–41.) But the reasons for a parent waiting to raise the issue of ICWA or Cal-ICWA non-compliance on appeal are quite clear: faced with the unimaginable prospect of losing custody of their child forever, and emboldened by our case law making such an approach perfectly lawful, it is completely understandable for parents to seek to do anything they can to undo the trial court's termination of parental rights. This is not "gamesmanship" (maj. opn., *ante*, at p. 41), but instead a logical response to the possibility of losing custody of one's own child forever. In fact, that is what occurred in this case: "[n]early 30 months into the proceedings and on appeal from the termination of her parental rights, [mother] for the first time object[ed] that the agency did not discharge its statutory duty to 'inquire' of 'extended family members' whether her children might be 'Indian child[ren].'" (*Dezi C., supra,* 79 Cal.App.5th at p. 774.)

Moreover, there *are* published cases describing parents seeking to delay the removal of their children from the home by

claiming Indian heritage. In *In re S.H.* (2022) 82 Cal.App.5th 166, 172 (*S.H.*), the Court of Appeal described a voicemail received by a social worker from the father, who apparently accidentally left his phone on after he completed his intended message. "In the apparent unintended portion of the recording, he discussed with [m]other a plan to claim that the minor had Indian ancestry to delay the Agency's removal of her from the home." (*Ibid.*)

While it is understandable that a parent may seek to forestall such a heartbreaking result as the termination of parental rights, this scenario makes it all the more clear why a rule of automatic conditional reversal is ill advised. Where a parent may be raising Cal-ICWA noncompliance solely to delay termination of parental rights; where there is no evidence at all that the child is or may be an Indian; and where the appealing parent herself or himself may have previously attested (like they did here) that the child has no Indian ancestry, then a rule of automatic reversal makes little sense.

## II.    Deference to the Adequacy of Cal-ICWA Inquiry

As described above, there are two ways that appellate courts can appropriately resolve issues related to Cal-ICWA compliance without needlessly delaying the proceedings: The first is by applying a flexible standard for prejudice to determine whether any error in the Cal-ICWA inquiry is harmless. For the reasons described above, I believe my colleagues have missed an opportunity with respect to this pathway. Notably, however, the majority still gives space for a second way that allows appellate courts the sufficient flexibility that is required in handling these complex cases. Rather than focusing on the appropriate standard of review if there was an inadequate inquiry under Cal-ICWA (automatic reversal versus harmless error review), alternatively, appellate courts could simply give appropriate deference to a

juvenile court's findings that the Cal-ICWA inquiry was adequate. Stated differently, if the appellate court concludes there was substantial evidence to support the juvenile court's determination that the Cal-ICWA inquiry was, in fact, *adequate* and ICWA does not apply, then it need not reach the question of whether reversal for Cal-ICWA error is required.

The majority rightly leaves room for this approach, explaining that "the juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' ([*Ezequiel G.*, *supra*,] 81 Cal.App.5th [at p.] 1005) subject to a deferential standard of review" (maj. opn., *ante*, at p. 27); and "[i]f, upon review, a juvenile court's findings that an inquiry was adequate and proper and ICWA does not apply are found to be supported by sufficient evidence and record documentation as required by California law ([Cal. Rules of Court, ]rule 5.481(a)(5)), there is no error and conditional reversal would not be warranted even if the agency did not inquire of everyone who has an interest in the child" (*id*. at pp. 27–28). Because the Department conceded the Cal-ICWA inquiry in this case was inadequate, the parties did not litigate the issue of whether the juvenile court's finding that ICWA does not apply is supported by substantial evidence. I write to expand on what this means for appellate courts going forward.

First, as the majority explains, a juvenile court's finding that the child welfare department met its inquiry requirements under Cal-ICWA is entitled to substantial deference on appeal. (*In re S.R.* (2021) 64 Cal.App.5th 303, 312, 278.) The statutory scheme specifically provides for a sufficiency of the evidence standard for reviewing the adequacy of the inquiry, stating: "If the court makes a finding that proper and adequate further inquiry and due diligence as required in this section have been conducted and there

is no reason to know whether the child is an Indian child, the court may make a finding that the federal [ICWA] does not apply to the proceedings, *subject to reversal based on sufficiency of the evidence*." (Welf. & Inst. Code, § 224.2, subd. (i)(2), italics added.) We normally apply a deferential standard of review in assessing the evidence's sufficiency because " '[c]onflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Second, Cal-ICWA itself confers significant discretion on juvenile courts in determining whether an inquiry was adequate. (See *Ezequiel G.*, *supra*, 81 Cal.App.5th at pp. 1006–1007.) In my view, Cal-ICWA does not require an inquiry of every single extended family member and person listed in the statute. Welfare and Institutions Code section 224.2, subdivision (b) requires that the Department "inquire whether [a dependent child] is an Indian child," and then provides that the "[i]nquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child . . . ." (Welf. & Inst. Code, § 224.2, subd. (b).) An " 'extended family member' " is (unless otherwise defined by an Indian child's tribe) an adult who is "the Indian child's grandparent, aunt or uncle, brother or sister,

brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. §1903(2); Welf. & Inst. Code, § 224.1, subd. (c) [adopting federal definition].)

I, like other courts which have interpreted the same language, do not read the statute as requiring that an initial Cal-ICWA inquiry be made of every member of a child's extended family, including every first and second cousin, every single niece and nephew, all aunts and uncles, all siblings-in-law, plus every other person who has an interest in the child. (*Ezequiel G., supra*, 81 Cal.App.5th at pp. 1005–1006.) Such a reading is "absurd at best and impossible at worst" (*id.* at p. 1006) and "creates an open-ended universe of stones, the rule ostensibly empowers the party to obtain a remand to question extended family members, then a second remand to question the family babysitter, and then a third remand to question longtime neighbors, and so on and so on." (*Dezi C., supra*, 79 Cal.App.5th at p. 785.) In fact, the majority appears to agree, at least to an extent, emphasizing its holding "does not require reversal in all cases in which every possible extended family member has not been asked about the child's Indian ancestry."[4] (Maj. opn., *ante*, at p. 27.)

---

[4] Given the fact that the question of what constitutes adequate notice is not at issue here, this makes it difficult for the majority to provide definitive guidance on this issue. But this unique procedural posture also makes it hard for the juvenile court to know how to proceed with remand instructions "to conduct an adequate inquiry." (Maj. opn., *ante*, at p. 2.) It similarly creates uncertainty for child welfare departments on remand to know what is meant by asking "extended family members and others" as required by statute (*id.* at p. 26), or " 'those people who are reasonably available to help the agency with its investigation' " (*id.* at p. 27), nor does it assist the

The better reading is that the " 'includes, but is not limited to' " language tells us that these are *examples* of the categories of people a social services agency or court should inquire of." (*In re A.C.* (2022) 86 Cal.App.5th 130, 142 (dis. opn. of Baker, J.); see also *H.V.*, *supra*, 75 Cal.App.5th at p. 440 (dis. opn. of Baker, J.) [Cal-ICWA has "no endpoint" and is "impossible to satisfy in practice"]; *Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 1005 ["The need for a juvenile court to exercise discretion in considering whether an ICWA inquiry is adequate is particularly acute because the scope of the inquiry required by state law is not well defined"].)

Indeed, the list in Welfare and Institutions Code section 224.2, subdivision (b) itself makes clear that the Department need not interview every person listed in this provision in every case. For example, if no one has identified any Indian ancestry, then contacting the proper "Indian custodian" becomes unfeasible. A "legal guardian" may not exist in every case for the Department to contact. The child may not have any nieces or nephews or siblings-in-law, or their nieces or nephews may be infants and therefore impossible to interview. Furthermore, if "the party reporting child abuse or neglect" is someone with only a minimal relationship with the child, like an emergency room doctor at a hospital, then it would make no sense to ask that person about the child's Indian ancestry. (*Ibid.*) Finally, the phrase "others who have an interest in the child," through its use of broad, non-specific language, also

---

agencies with understanding the parameters of an inquiry that is meant to be " 'slight and swift' " (*id.* at p. 31). To be clear, I do not suggest that the majority should have tackled these thorny questions. They admittedly are not presented by the petition for review. But the uncertainty created by this procedural posture is nonetheless unfortunate.

suggests itself that courts have discretion in determining exactly who these indeterminate "others" are. (*Ibid*.)

This kind of flexibility in interpreting the requirements of Cal-ICWA is crucial. Imagine a case where the Department had interviewed every single person enumerated by the statute, so assume that the Department interviewed 40 people, and all of them had said the child had no Indian ancestry, but the Department failed to speak to one of the child's eight aunts. Under this hypothetical it would be absurd to conclude that the inquiry was inadequate and automatic conditional reversal was required. Or let us imagine a case involving a child who, with his entire family, recently immigrated from Ukraine, thereby making it highly improbable that the child is a member of, or may be eligible for membership in, a federally recognized Indian tribe. Any court would be hard pressed to find that the Department's inquiry regarding his or her Indian ancestry was inadequate because it did not ask his or her entire extended (Ukrainian) family about Indian descent. The same would be true for a case where the Department had recently completed an adequate Cal-ICWA inquiry for the child's sibling in a different dependency case — it would be illogical to hold that the inquiry was inadequate because the Department failed to recontact all the same extended family members.

In sum, in reviewing a juvenile court's Cal-ICWA findings for abuse of discretion, I believe "a proper application of the governing substantial evidence standard of appellate review mitigates some of the flaws in the statutory scheme." (*H.V.*, *supra*, 75 Cal.App.5th at p. 441 (dis. opn. of Baker, J.).) I further believe "the focus of the court's analysis should not be on the number of individuals interviewed, but on whether the agency's [Cal-ICWA] inquiry has yielded reliable information about a child's possible tribal affiliation." (*Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 1009; accord,

*In re E.W.* (2023) 91 Cal.App.5th 314, 322.)    In order to appropriately balance the importance of Cal-ICWA compliance with the best interest of children in the dependency system, appellate courts should bear in mind that a juvenile court's finding that Cal-ICWA inquiry was satisfied and that ICWA does not apply is entitled to substantial deference and that the requirements imposed by Cal-ICWA are flexible.[5]

## III.  Conclusion

This case is a prime example of why adhering to our traditional review of claims of state law error on appeal is necessary.  Dependency proceedings were initiated when Dezi C. was three and a half years old and her brother, Joshua C. was one and a half years of age.  The children are now over eight and six years old.  They have spent most of their short lives in the dependency system.  The juvenile court sustained allegations that the minors were at risk of harm in the custody of mother and father

---

[5]    Furthermore, though the instant case presents an appeal from an order terminating parental rights, other cases may arise in the context of an interlocutory appeal, where dependency proceedings are still ongoing. (See, e.g., *S.H.*, *supra*, 82 Cal.App.5th at pp. 171, 179; *In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 638.)  In such a case, some Court of Appeal decisions find that because the Department has a *continuing* duty of inquiry and because, unlike the present case, there will necessarily be further dependency proceedings in the juvenile court, reversal based upon a prior failure to adequately inquire as to Indian ancestry may be unnecessary. (See *S.H.*, at p. 179 ["So long as proceedings are ongoing and all parties recognize the *continuing* duty of ICWA inquiry," then "disturbing an early order in a dependency proceeding is not required where, as here, the court, counsel, and the Agency are aware of incomplete ICWA inquiry"].)  Though this fact pattern is neither presented nor decided here, this may be another way to avoid needless reversal in cases involving such a procedural posture.

due to the parents' substance abuse and domestic violence issues. Their paternal grandparents have provided a safe and stable environment and stand ready to permanently adopt them, but the majority today ensures that this crucial permanent placement will again be delayed. The instability and uncertainty caused by removing Dezi C. and Joshua C. from their parents and delaying permanent placement with their paternal grandparents does not serve the best interest of the children. Today, this court strays from its previous repeated and rightful admonitions that a "child has a compelling right to a stable, permanent placement that allows a caretaker to make a full emotional commitment to the child" (*Celine R.*, *supra*, 31 Cal.4th at p. 59) and that although even a four-month delay "may not seem a long period of time to an adult, it can be a lifetime to a young child." (*Marilyn H.*, *supra*, 5 Cal.4th at p. 310.) It also diverges from our constitutional mandate that no judgment shall be set aside unless the error complained of has resulted in a miscarriage of justice. (Cal. Const. art. VI, § 13.) Both parents here signed ICWA forms under penalty of perjury indicating that they do not have Indian ancestry and after years of litigation, there has never been a glimmer of evidence to suggest that the children are Indian. Nonetheless, because the Department failed to ask additional family members about the children's ancestry, my colleagues invoke a rule of automatic conditional reversal that is wholly inconsistent with the way in which California courts have assessed state law error for almost seven decades. In the process, the majority forgoes a far more practical approach that would avoid automatic reversal but allow for reversal if there were a minimal showing that further inquiry might be useful. And the majority takes this approach even though the mother's own counsel admits that this delay will likely be for naught, conceding at oral argument that the likelihood of a child in

these circumstances having Indian ancestry and being placed with a tribe is "minimal." The majority's formulaic approach needlessly condemns these children and others like them to more uncertainty, more instability, and more trauma. I dissent.

**GROBAN, J.**

**I Concur:**
**GUERRERO, C. J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  In re Dezi C.

---

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 79 Cal.App.5th 769
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S275578
**Date Filed:** August 19, 2024

---

**Court:** Superior
**County:** Los Angeles
**Judge:** Robin R. Kesler

---

**Counsel:**

Karen J. Dodd and John L. Dodd, under appointments by the Supreme Court, for Defendant and Appellant.

Suzanne Nicholson, Sean Angele Burleigh and Christopher Blake for California Appellate Defense Counsel as Amicus Curiae on behalf of Defendant and Appellant.

Dorothy Alther, Hannah Reed, Laura Pedicini, Sheila Quinlan; Kimberly Cluff and Shunya Wade for California Indian Legal Services and California Tribal Families Coalition as Amici Curiae on behalf of Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

Jennifer Henning; Claudia G. Silva, County Counsel (San Diego), Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy

County Counsel, for the California State Association of Counties as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John L. Dodd
Attorney at Law
17621 Irvine Boulevard, Suite 200
Tustin, CA 92780
(714) 731-5572

Stephen Watson
Deputy County Counsel
500 West Temple Street, Suite 648
Los Angeles, CA 90012
(213) 808-8774